OPINION
 

 BILL BASS, Justice
 

 (Retired).
 

 Castle Texas Production Limited Partnership (“Castle”), Castle Texas Pipeline Limited Partnership (“Castle Pipeline”), CEC Gas Marketing Limited Partnership (“CEC”), and Castle Energy Corporation (“Castle Energy”) (collectively the “Castle entities”) appeal an adverse judgment awarding the Long Trusts actual and exemplary damages for conversion of the Long Trusts’ natural gas, prejudgment interest, and attorneys’ fees. The Castle entities present for our review twenty issues, including seven conditional issues, each of which includes several subissues. The Long Trusts, as Cross-Appellants, raise three issues. We conditionally affirm in part and reverse and remand in part.
 

 Background
 

 In December 1992, Castle bought Atlantic Richfield’s interest in several producing leases comprising six gas units in Rusk County, Texas. Castle also succeeded to Atlantic Richfield’s position as operator under the joint operating agreements (“JOAs”) governing the operation of the leases. Incorporated within each JOA as Exhibit “E” was a gas balancing agreement (“GBA”) providing generally that a party or its purchaser unable to take its share of the gas produced should be credited with gas in storage equal to its share of the gas produced. When able to market its share, the underproduced party was entitled to take its share plus twenty-five percent of the overproduced parties’ share of gas produced until it had recovered the gas in storage (“banked gas”). The GBA did not provide for the balancing of condensate production.
 

 When Castle became the operator, the Long Trusts were not taking their share of the gas produced, and according to the agreement, their share was credited to them as banked gas. This continued so that by February 28, 1996, the Long Trusts had, according to their records, 668,824 mcf of banked gas. The GBAs called for the operator to “maintain a current account of the gas balance[s] between the parties and furnish all parties ... monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.”
 

 Shortly after Castle became the operator, it began sending out joint interest billings (“JIBs”) for expenses incurred in opérating the wells. The Long Trusts never paid any of the joint operating expenses reflected by the JIBs Castle sent them. During the period that the Long Trusts’ share of gas production was being banked, Castle sold the Long Trusts’ share of the condensate production, but accounted to the Long Trusts only sporadically. The Long Trusts insist that they were not paid for most of the condensate.
 

 In February 1996, the Long Trusts sold at the wellheads their gas production from the gas units to Cherokee Gas Marketing, Inc. (“Cherokee”) and notified Castle that they wanted to start taking their gas effective March 1, 1996. Castle responded that the Long Trusts needed to contract with Castle Pipeline to begin taking the gas. Castle Pipeline was a common carrier and owned the only pipeline connection to the wells. After several prolonged delays, Cherokee and Castle Pipeline arrived at a transportation agreement in January 1997. The parties disagree about the causes of
 
 *272
 
 the delay, but during that eleven-month period, the Long Trusts’ share of production continued to be credited to it as banked gas. By January 31, 1997, the Long Trusts’ banked gas amounted to 748,039 mcf, an increase of approximately 85,000 mcf during the eleven months.
 

 On April 19, 1996, early in the delay in arriving at a transportation agreement, the Long Trusts
 
 [1]
 
 sued Castle alleging Castle’s breach of the JO As and conversion of the Long Trusts’ share of the gas and gas condensate production. Castle denied the Long Trusts’ claims and responded with a counterclaim for $149,407.94 in unpaid JIBs for the costs of lease operations. The Long Trusts later joined Castle Energy, Castle Pipeline, and CEC as defendants alleging that (1) those entities and Castle integrated their resources to achieve a common business purpose and thereby operated as a single business enterprise and that (2) Castle, Castle Pipeline, and CEC were alter egos of Castle Energy.
 

 On June 27, 1996, Texas Utilities Mining Company (“TUMCO”), the owner of the surface minerals, obtained the agreement of the working interest owners to abandon and plug the Kangerga “A” No. 1 well in order that TUMCO could mine its lignite. TUMCO paid the working interest owners $300,000.00, out of which $53,811.90 was paid to the Long Trusts, an amount in proportion to their fractional working interest in the well. The agreement recited “this agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements.” The agreement did not mention the accumulated banked gas referable to that well. Under the GBA, the permanent cessation of production from a well mandated a complete balancing by a money settlement of the gas accounts referable to that well. When production ceased in the Kangerga “A” No.l, the Long Trusts had banked gas referable to the well. However, the balance was apparently maintained as a credit against future production from the other wells despite a contractual provision to the contrary.
 
 [2]
 

 On February 1, 1997, Cherokee began taking the Long Trusts’ share of production together with an additional twenty-five percent of production as a withdrawal of the Long Trusts’ banked gas. Cherokee continued to sell the Long Trusts’ gas until trial. On their own initiative, the Long Trusts suspended the sale of their banked gas from June 1998 until July 1, 2000. By September 30, 2000, shortly before the November trial, the Long Trusts had reduced their accumulated volume of banked gas to 489,598 mcf.
 

 By trial, the Long Trusts had sold far more banked gas than was credited to them as banked gas during the March 1, 1996 to February 1, 1997 period that the Long Trusts claim Castle denied them the right to sell their gas. Moreover, it appears they sold it for a higher price per mcf than that obtainable during the eleven-month period in question.
 

 After a jury trial, the trial court entered judgment against Castle, Castle Pipeline, CEC, and Castle Energy, jointly and severally, for $1,573,078.20 in actual damages for conversion of the Long Trusts’ gas,
 
 *273
 
 $811,357.14 for prejudgment interest, $250,000.00 for exemplary damages against Castle, and an additional $250,000.00 for exemplary damages against Castle Energy. The judgment also ordered the Castle entities to pay the Long Trusts $598,458.63 as attorneys’ fees through trial and additional attorneys’ fees in the event of an unsuccessful appeal.
 

 The judgment granted Castle recovery against the Long Trusts on the unpaid JIBs in the amount of $170,000.00, prejudgment interest of $73,998.90, attorneys’ fees of $600,000.00 through trial, and additional attorneys’ fees on appeal.
 

 Standard of Review
 

 Castle presents twenty issues with two to four subissues under each issue. Many challenge the legal or factual sufficiency of the evidence.
 

 In considering a legal sufficiency or “no evidence” issue, the reviewing court considers only the evidence which tends to support the jury’s findings and disregards all evidence and inferences to the contrary.
 
 Garza v. Alviar,
 
 395 S.W.2d 821, 823 (Tex.1965). If any probative evidence supports the jury’s determination, it must be upheld.
 
 In re King’s Estate,
 
 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951).
 

 A factual sufficiency challenge to a finding on which the other party had the burden of proof requires the attacking party to demonstrate that there is insufficient evidence to support the adverse finding.
 
 Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,
 
 766 S.W.2d 264, 276 (Tex.App.-Amarillo 1988, writ denied). In reviewing the challenge, the court of appeals must consider all of the evidence and set aside the verdict only if the evidence that supports the verdict is so weak as to be clearly wrong and unjust.
 
 Cain v. Bain,
 
 709 S.W.2d 175, 176 (Tex.1986). When a party challenges a jury finding regarding an issue upon which it had the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence.
 
 Dow Chemical Co. v. Francis,
 
 46 S.W.3d 237, 242 (Tex.2001). The court of appeals must first examine the record to determine if there is some evidence to support the finding. If so, then the court of appeals must determine, in the light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust.
 
 Id.
 

 The Conversion Claim
 

 In its first issue, Castle insists that the JOAs and the attached GBAs specified the rights and obligations of the parties with respect to gas production and contained express provisions governing the facts of this case. Castle argues that the Long Trusts cannot maintain a claim for conversion because the Long Trusts had to establish a breach of contract to prevail and because the Long Trusts’ only injury, if any, was the economic loss to the subject of the contract. In support of its argument, Castle cites
 
 Southwestern Bell v. DeLanney,
 
 809 S.W.2d 493, 495 n. 2 (Tex.1991).
 

 The Long Trusts argue that the holding by the supreme court in
 
 Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,
 
 960 S.W.2d 41, 46 (Tex.1998) supports their position that a tort action and a contract action may arise from the same conduct if the defendant’s conduct breaches a duty independent from the promises made in the contract. In
 
 Formosa,
 
 the supreme court stated that it was already well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself.
 
 Id.
 
 The
 
 Formosa
 
 court created an excep
 
 *274
 
 tion to the independent injury rule in fraudulent inducement cases and allowed the recovery of tort damages measured in terms of the benefit of the bargain.
 
 Id.
 
 at 47. In the Long Trusts’ view, “conversion is based upon the independent legal duty that one should not steal from another” and is therefore closely analogous to fraud.
 

 The contractual relationship of the parties may create duties under both tort and contract law, and, depending upon the circumstances, a party’s conduct may breach duties in tort or contract alone or simultaneously in both.
 
 Jim Walter Homes, Inc. v. Reed,
 
 711 S.W.2d 617, 618 (Tex.1986). “The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.”
 
 Id.; see also DeLanney,
 
 809 S.W.2d at 495. Economic loss in this context has been defined as
 

 damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property ... as well as the diminution in the value of the product, because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.
 

 Thomson v. Espey Huston & Assoc., Inc.,
 
 899 S.W.2d 415, 421 (Tex.App.-Austin 1995, no writ) (quoting
 
 2314 Lincoln Park West Condominium Ass’n v. Mann, Gin, Ebel & Frazier, Ltd.,
 
 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346, 348 (1990)).
 
 Montgomery Ward v. Scharrenbeck,
 
 146 Tex. 153, 204 S.W.2d 508, 510 (1947), as well as the
 
 Thomson
 
 case, illustrates how an injury independent of and beyond the contract points to a breach of duty under tort law.
 

 In
 
 Scharrenbeck,
 
 the defendant Montgomery Ward’s employee negligently repaired and adjusted a kerosene hot water heater with the result that within a day, the house where it was located burned to the ground. In failing to properly repair the water heater, Ward breached the contract. But the court held that the law also implied a duty on the defendant’s part to repair and regulate the heater “with reasonable skill and diligence ... so as not to injure a person or property by his performance.”
 
 Scharrenbeck,
 
 204 S.W.2d at 510;
 
 see also DeLanney,
 
 809 S.W.2d at 494. The destroyed house was not within the subject matter of the contract.
 

 In the
 
 Thomson
 
 case, Thomson alleged that Espey’s negligence in designing a drainage system for part of an apartment complex project caused damage to buildings in other parts of the complex, and caused standing water to accumulate and spill onto adjacent property and block a street. In finding that Espey had an independent duty not to negligently damage Thomson’s property or the property of his neighbors, the court pointed out that the damage to the other parts of the complex and to the neighbor’s property was not merely economic loss to the subject of the contract itself. The court held that to the extent that Espey’s incompetent engineering injured property beyond the contract, Thomson had a tort claim.
 
 Thomson,
 
 899 S.W.2d at 422.
 

 Some contracts such as insurance contracts, contracts for professional services, and contracts creating fiduciary relationships create relationships that may give rise to duties enforceable as torts. But except for those special contexts, and in the absence of independent injury, if a contract spells out the parties’ respective rights regarding a particular matter, the contract, not common law tort principles, governs any dispute about that matter.
 
 See DeWitt County Elec. Co-op. v. Parks,
 
 1 S.W.3d 96, 105 (Tex.1999).
 

 
 *275
 
 The Long Trusts rely in part on
 
 Formosa’s
 
 exception to the independent injury rule in fraudulent inducement cases, and urge the analogy between fraud and conversion. We have found, however, no case that extends the supreme court’s holding in
 
 Formosa
 
 beyond claims for fraud.
 
 [3]
 
 In
 
 D.S.A., Inc. v. Hillsboro ISD,
 
 973 S.W.2d 662, 663 (Tex.1998), the supreme court expressly refused to extend to negligent misrepresentation cases Formosa’s exception to the independent injury requirement in fraudulent inducement cases. The court found it unnecessary to decide whether DSA had breached a legal duty independent of its contractual duties, but concluded that the school district’s attempted tort recovery for negligent misrepresentation must fail for lack of any independent injury.
 
 Id.
 

 In the instant case, the JOAs and them appended GBAs state explicitly and in great detail the rights and duties of the parties with reference to the gas and gas condensate production and gas balancing. They contain express provisions that deal with the circumstances of this case. “[I]f [, as here,] a party must prove the contents of its contract and relies on the duties created therein, the action is in substance an action on the contract.”
 
 Morriss v. Enron Oil & Gas Co.,
 
 948 S.W.2d 858, 869 (Tex.App.-San Antonio 1997, no writ). In the case at bar, the Long Trusts’ loss was entirely economic loss to the subject matter of the contracts, the JOAs. The Long Trusts have not alleged or proven fraud. Consequently, we conclude that the Long Trusts are not entitled to recover on the theory of conversion. Castle’s first issue is sustained.
 

 THE BREACH OF CONTRACT CLAIM
 

 Did Castle Breach the JOAs by Failing to Pay the Long Trusts for Their Share of the Condensate?
 

 In its third issue, Castle attacks the jury finding in response to Question 2E, that Castle failed to account for or pay the Long Trusts for their condensate. It contends that the finding is insupportable because (1) the evidence conclusively establishes that Castle did pay the Long Trusts for their condensate, (2) the evidence is factually insufficient, and (3) the affirmative answer was caused by the erroneous exclusion of evidence of payment.
 

 First, Castle asserts that it paid the Long Trusts for their condensate by giving the Long Trusts credit for the condensate on what they owed for operating expenses as shown on the JIBs. Castle points out that Paragraph 4 of Exhibit “C” to the JOAs requires a non-operator such as the Long Trusts to commence an audit within two years in order to question the accuracy of the JIBs and to make written exception to any bills or statements. Since the Long Trusts never commenced an audit or excepted in writing to any of the charges or statements, Castle contends that under the terms of the JOAs the charges are conclusively presumed to have been correct.
 

 Paragraph 5 of the accounting procedure, Exhibit “C” to the JOAs, provides “[a] Non-Operator, upon notice in writing to Operator ... shall have the right to audit Operator’s accounts and records relating to the Joint Account for any calendar year within the twenty-four (24)
 
 *276
 
 month period following the end of such calendar year....” “Joint Account” is defined in Paragraph 1 of Exhibit “C” as “the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.” The Long Trusts argue that Exhibit “C” to the JOAs does not refer to revenue accountings. Further, they insist that the JIBs are not bills or statements that reflect production revenues, but show only joint expenses. We agree. We have reviewed the JIBs in evidence, and we cannot find any entries reflecting a credit for production. Moreover, Castle in its Original Counterclaim and First Amended Counterclaim stated that as to indebtedness shown by the JIBs, there were no payments, offsets or credits.
 

 Castle claims, in the alternative, that it paid the Long Trusts for their condensate production and that the trial court erred in excluding the greater part of their evidence of payment. The trial court excluded evidence of Castle’s payments to the Long Trusts because it found that Castle failed to comply with Rule 95 of the Texas Rules of Civil Procedure. Rule 95 provides as follows:
 

 When a defendant shall desire to prove payment, he shall file with his plea an account stating distinctly the nature of such payment, and the several items thereof; failing to do so, he shall not be allowed to prove the same, unless it be so plainly and particularly described in the plea as to give the plaintiff full notice of the character thereof.
 

 Tex.R. Civ. P. 95. Payments not admitted in the plaintiffs petition must be specifically alleged.
 
 See Rea v. Sunbelt Sav., FSB, Dallas,
 
 822 S.W.2d 370, 372 (Tex.App.-Dallas 1991, no writ). The Long Trusts contend that Castle’s plea of payment did not plainly and particularly describe the payments with the specificity required to satisfy Rule 95. ■ Castle maintains that its plea of payment coupled with its answers to Plaintiffs Request for Disclosure satisfied the rule. In its third amended response to Plaintiffs Request for Disclosure filed a week before trial, Castle listed by gas unit total condensate payments to the Long Trusts. Castle also contends that the trial court erred in excluding its evidence of payments because evidence of a similar character previously had been introduced without objection.
 

 The admission or exclusion of evidence is generally a matter within the trial court’s discretion.
 
 Owens-Corning Fiberglas Corp. v. Malone,
 
 972 S.W.2d 35, 43 (Tex.1998). To obtain a reversal of judgment based on error in the exclusion of evidence, Castle must show that (1) the exclusion of the evidence was error and (2) that the error “probably” resulted in an improper judgment.
 
 See McCraw v. Maris,
 
 828 S.W.2d 756, 757 (Tex.1992). In making this determination, an appellate court must review the entire record.
 
 Id.
 
 at 758.
 

 We agree with the Long Trusts that Castle’s pleadings fail to describe with the requisite particularity the nature and amount of each payment, and we conclude that Castle’s responses to the Long Trusts’ request for disclosure are insufficient to satisfy the rule. The trial court did not err in excluding the evidence. Castle’s third issue is overruled.
 

 Are the Condensate Damages Excessive?
 

 In its fourth issue, Castle contends, inter alia, that the damages found by the jury for unpaid condensate are not supported by legally or factually sufficient evidence and are excessive. We agree. In arriving at its answer, the jury relied upon a summary of the condensate sales from the wells from 1991-97 showing a total value due the Long Trusts of $90,005.59. From this they deducted the approximately
 
 *277
 
 $6,646.38 in payments in evidence to arrive at damages of $83,354.00 for Castle’s failure to pay the Long Trusts for their condensate. Castle did not become responsible for payments to the Long Trusts for condensate production before February 1992 at the earliest. The figure for total condensate sales relied upon by the jury included sales from the year 1991, a period antedating Castle’s responsibility. In their closing argument, the Long Trusts told the jury they should rely on Plaintiffs Exhibit 171 in finding damages in the amount of $51,346.00 for unpaid condensate. Deducting the 1991 condensate sales from the totals given in Plaintiffs Exhibit 171 leaves a total due the Long Trusts of approximately $57,200.00 from which $6,646.38 in payments must be deducted. Both the Long Trusts’ evidence and argument demonstrate the excessiveness of the damages. Castle’s fourth issue is sustained.
 

 Exemplary Damages
 

 In their fifth issue, Castle and Castle Energy challenge the award of exemplary damages, contending that there was no basis for the submission of the issues serving as the predicate for an award of exemplary damages.
 

 In response to Question No. 23, the jury assessed $250,000 in exemplary damages against Castle. In its answer to Question No. 24, the jury awarded the Long Trusts an additional $250,000.00 in exemplary damages assessed against Castle Energy.
 

 The exemplary damage findings were conditioned on affirmative answers to a series of questions. Questions 2A and 2B asked the jury if Castle between March 1, 1996 until February 1, 1997 failed to permit the Long Trusts to sell their monthly share of production plus an additional 25% share to compensate for past underproduction. Question 5, conditioned upon a “yes” answer to 2A or 2B, asked if Castle became the agent for the Long Trusts by allocating and distributing the gas referred to in Questions No. 2A and 2B. Contingent upon their finding of agency in answer to Question No. 5, Question No. 6 inquired if Castle, as the Long Trusts’ agent, had breached its fiduciary duty to The Long Trusts. Question No. 7 asked if Castle converted the Long Trusts’ share of gas production and allotment of underpro-duced gas. Dependent upon a finding of breach of fiduciary duty or conversion, the trial court in Question No. 11 asked the jury if the harm resulting from the breach of fiduciary duty or from the conversion resulted from malice.
 

 Castle and Castle Energy contend that punitive damages are not recoverable in this case for conversion or breach of fiduciary responsibility, the only two theories submitted that could support an award of exemplary damages. We agree. The trial court submitted the Long Trusts’ case on the wrong theory. Because they had to rely on proof of the contractual provisions and could show no injury independent of contract damages, we have held their suit was for breach of contract, not conversion. Exemplary damages are not available for breach of contract, even if the contract was maliciously breached.
 
 See Manges v. Guerra,
 
 673 S.W.2d 180, 184 (Tex.1984). The trial court erred in submitting the conversion issue. The Long Trusts may not recover exemplary damages based on the jury’s finding of conversion.
 

 We also conclude that, as a matter of law, neither the JOAs nor the conduct of the parties created a fiduciary relationship between The Long Trusts and any of the Castle entities. Under Texas law, a joint operating agreement does not create a fiduciary relationship unless the parties are also joint venturers.
 
 See Norman v. Apache Corp.,
 
 19 F.3d 1017, 1024
 
 *278
 
 (5th Cir.1994)(applying Texas law);
 
 Hamilton v. Texas Oil & Gas,
 
 648 S.W.2d 316, 321 (Tex.App.-El Paso 1982, writ ref'd n.r.e.). The elements of a joint venture are (1) mutual right of control, (2) community of interest, (3) the sharing of profits as principals, and (4) the sharing of losses, costs, or expenses.
 
 See Ayco Dev. Corp. v. G.E.T. Service Co.,
 
 616 S.W.2d 184, 186 (Tex.1981). Under the JOAs in this case, the parties had no mutual right of control. Article V.A. provides that the operator “shall conduct and direct and have full control of all operations.... ” Article VII. A. states “[i]t is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.” Castle’s actions in “allocating and distributing” gas were contemplated and provided for in the GBAs and did not create an agency relationship between Castle and the Long Trusts.
 

 It is the Long Trusts’ position that when Castle and the other non-operating working interest owners continued to sell the Long Trusts’ share of production after notice to Castle that the Long Trusts wanted to resume taking their gas, Castle became the Long Trusts’ agent in marketing the Long Trusts’ gas. Hence, in their view, a fiduciary relationship was created as was the case in
 
 Atlantic Richfield Co. v. Long Trusts,
 
 860 S.W.2d 439 (Tex.App.-Texarkana 1993, writ denied). However, in the ARCO case, ARCO was selling the Long Trusts’ gas under Section VI. C. of the JOAs. Since taking over as operator in the contract area, Castle had refused to market the Long Trusts’ gas. After notice from the Long Trusts and until Cherokee had made an agreement with Castle Pipeline to transport the gas Cherokee had bought from the Long Trusts, Castle and the other operators continued to take 100% of production as provided by the GBAs and they continued to credit the Long Trusts with banked gas. This action by Castle and the other non-operators under the GBAs did not constitute a sale of the Long Trusts’ gas by Castle. The
 
 Atlantic Richfield
 
 case is inapposite. There is no basis for the award of exemplary damages against Castle Production or Castle Energy.
 

 The Long Trusts’ Attorneys’ fees
 

 Since that part of the judgment awarding the Long Trusts conversion damages and punitive damages must be reversed and remanded for new trial, the award of attorney’s fees must also be reversed and remanded. Castle complains that the Long Trusts are not entitled to attorney’s fees. Because the question is likely to recur upon retrial, we will address the issue. In its answer to the question submitted regarding the Long Trusts’ attorney’s fees, the jury answered “$300,-000/15%.” Attorney Frank Honea testified that the Wellborn-Houston law firm agreed to represent the Long Trusts for a fee of 15%, and that such a fee was reasonable. Castle complains that he did not testify that the fee was reasonable in the light of the factors set out in Texas Disciplinary Rule of Professional Conduct 1.04. Castle argues that in the absence of such testimony, the Long Trusts were not entitled to recover attorney’s fees for the services rendered by the Wellborn-Houston firm. We agree. Without evidence of the reasonableness of the fee measured against the factors contained in Disciplinary Rule 1.04, “the jury has no meaningful way to determine if the fees were in fact reasonable and necessary.”
 
 Arthur Andersen v. Perry Equip. Corp.,
 
 945 S.W.2d 812, 819 (Tex.1997).
 
 Andersen
 
 was a DTPA case, but its holding has been followed in contract disputes.
 
 See VingCard A.S. v. Merrimac Hospitality Sys.,
 
 59
 
 *279
 
 S.W.3d 847, 869-70 (Tex.App.-Fort Worth 2001, pet. denied);
 
 Transcontinental Gas Pipeline Corp. v. Texaco, Inc.
 
 35 S.W.3d 658, 675 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). The supreme court in
 
 Andersen
 
 also held that the jury should be asked to award fees in a specific dollar amount, and not as a percentage of the judgment.
 
 Andersen,
 
 945 S.W.2d at 819.
 

 The factors the jury should consider in determining the reasonableness of a fee are as follows:
 

 (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
 

 (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
 

 (3) the fee customarily charged in the locality for similar legal services;
 

 (4) the amount involved and the results obtained;
 

 (5) the time limitations imposed by the client or by the circumstances;
 

 (6) the nature and length of the professional relationship with the client;
 

 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 

 (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.
 

 Tex. Disciplinary R. Prof’l Conduct 1.04,
 
 reprinted in
 
 Tex. Gov’t Code Ann., tit. 2, subtit. G app. (Tex. State Bar R. art. X, § 9);
 
 Andersen,
 
 945 S.W.2d at 818. In the event of retrial, the evidence of the reasonableness of attorneys’ fees should reflect that the witnesses’ opinions were based on these factors.
 

 Castle’s Affirmative Defenses Accord and Satisfaction
 

 Castle also asserts that the Long Trusts’ claims for payment for condensate sales are barred under the doctrines of accord and satisfaction, res judicata, and collateral estoppel. The trial court submitted Castle’s affirmative defense of accord and satisfaction as to the Long Trusts’ claim for nonpayment of condensate sales. The jury found there had been an accord and satisfaction. The evidence established that a judgment was rendered for the Long Trusts covering all claims the Long Trusts could have asserted against ARCO while ARCO was operator. Uncontroverted evidence shows that ARCO paid that judgment and that the Long Trusts accepted that payment in full satisfaction of their claim. But the events that formed the basis of the Long Trusts’ suit against ARCO ended in January 1991 before Castle was the operator of the wells and therefore before the events occurred upon which this suit is based. Castle’s contention that the Long Trusts’ claims are barred by the doctrines of accord and satisfaction, res judicata, and collateral estop-pel is without merit.
 

 Prior Breach of the JOAs
 

 Did a prior breach of the JOAs by the Long Trusts preclude their contract claims?
 

 The jury found that the Long Trusts were the first to materially breach the JOAs. Castle argues that the trial court erred in refusing to render judgment that the Long Trusts take nothing on their claims based on this finding. Castle insists that “a party who has himself breached a contract may not insist upon performance by the other party, nor complain of or recover damages for a subsequent breach by the other party....”
 
 See Mead v. Johnson Group, Inc.,
 
 615 S.W.2d 685, 689 (Tex.
 
 *280
 
 1981);
 
 Presley v. Cooper,
 
 278 S.W.2d 237, 241 (Tex.Civ.App.-Amarillo 1955),
 
 rev’d on other grounds,
 
 155 Tex. 168, 284 S.W.2d 138 (Tex.1955).
 

 The trial court gave the following grounds for its disregard of the jury’s answer:
 

 i. Castle Production’s filing and pursuing of its counterclaim deprived it of any excuse for its own nonperformance;
 

 ii. The covenants in the JOAs regarding the non-operator’s payment for JIBs and the operator’s accounting for oil and gas sales were “independent”; and
 

 iii. There was “legally insufficient evidence” to support the jury’s answer.
 

 Throughout this dispute Castle has treated the JOAs as continuing contracts. “A party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part.”
 
 Hanks v. GAB Business Services, Inc.,
 
 644 S.W.2d 707, 708 (Tex.1982). Castle’s issue contending that the Long Trusts prior breach excused Castle’s future performance is without merit and overruled.
 

 Does the election of remedies doctrine bar the Long Trusts’ claims?
 

 The election doctrine may bar relief “when (1) one successfully exercises an informed choice (2) between two or more remedies, rights or states of facts (3) which are so inconsistent as to (4) constitute manifest injustice.”
 
 Bocanegra v. Aetna Life Ins. Co.,
 
 605 S.W.2d 848, 851 (Tex.1980).
 

 The jury specifically found that the Long Trusts made no election of remedies. But Castle asserts that after its alleged breach of contract, the Long Trusts had two choices. They could elect to affirm the JOAs and sue for specific performance, or they could consider the JOAs at an end and sue for damages. Castle claims that the Long Trusts elected to affirm the JOAs because they thereafter claimed the right to take gas as well as banked gas to make up for their underproduction. In Castle’s view, this constituted an election precluding the Long Trusts’ suit for breach of contract.
 

 We believe Castle’s argument misstates the law applicable to our facts. Castle’s alleged breach did not confront the Long Trusts with an election to (1) pursue specific performance or (2) sue for damages. In the case relied upon by Castle,
 
 Kingsbery v. Phillips Petroleum, Company,
 
 315 S.W.2d 561 (Tex.Civ.App.-Austin 1958, writ ref'd n.r.e.), the court held that by electing specific performance of the contract, the plaintiffs were barred by election from an action for damages for the contract’s anticipatory breach.
 
 Kingsbery
 
 is inapposite to the facts of this case. In the case of a partial breach, or where the contract is severable, or its covenants independent, one may continue performance and bring action for its breach.
 
 See, e.g., Hanks,
 
 644 S.W.2d at 708.
 

 As with estoppel, the most important element in proving an election of remedies is manifest injustice to the defendant that would result from allowing the plaintiff to pursue other remedies because of the defendant’s detrimental and reasonable reliance or change of position based upon plaintiffs earlier choice of remedy.
 
 Bocanegra,
 
 605 S.W.2d at 851;
 
 see also
 
 Arthur Linton Corbin, Corbin on Contracts § 1220 (1964). The Long Trusts’ choice of remedies has worked no injustice on Castle. The issue is overruled.
 

 Will the breach of contract ftndings support an alternative judgment?
 

 In its answers to Questions 2A and 2B, the jury found that Castle breached the
 
 *281
 
 JOAs by failing to permit the Long Trusts to sell their share of gas and banked gas. In its answers to Questions 13 and 14, the jury found damages resulting from this conduct in the amounts of $832,656.00 and $77,671.00. The jury, in its answer to Question 2C, found that Castle had breached the GBA governing that well by failing to arrive at a cash settlement for their underproduced balances in the Kangerga “A” No. 1 well when that well ceased to produce. The jury found that this conduct caused the Long Trusts damages of $49,078.00.
 

 The trial court did not rely on these breach of contract findings in fixing damages although they were cited in the judgment. Nevertheless, Castle contends that they cannot serve as the basis of an alternate judgment based upon breach of contract rather than conversion. Castle maintains the evidence is legally and factually insufficient to support both the liability and the damage findings.
 

 On February 1, 1996, the Long Trusts sold their share of production to Cherokee. On the same day, they sent written notice to Castle that they wanted to begin taking them share of gas produced pursuant to the following provision in the GBAs:
 

 After notice to Operator, any party may begin taking or delivering its share of the gas produced.
 
 In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent (25%) of each overproduced party’s share of the gas produced. (Emphasis added).
 

 During the initial communications, the Long Trusts were told that they would need a transportation contract, and that they could not move their gas until they paid the $120,000.00 they owed on the joint interest billings. Although insisting on a transportation agreement before taking the Long Trusts’ gas, Castle and its buyer MG Natural Gas were not required to have such an agreement. There is also evidence that Castle engaged in other conduct from which it could be inferred Castle unreasonably delayed the Long Trusts in taking their gas. Although it is noteworthy that from May until December 1990 neither the Long Trusts nor their gas buyer, Cherokee, made an effort to secure a transportation agreement with Castle Pipeline, it is also true that the matter was not settled until January 1997 while Castle was attempting to resolve problems that might interfere with the sale of its assets to UPRC. Measured by the appropriate standard of review, we conclude that the evidence is both legally and factually sufficient to support the jury’s answers to Question 2A and 2B.
 

 The jury found damages of $832,656.00 referable to Castle’s failure to let the Long Trusts sell their gas production between March 1, 1996 and February 1, 1997. The jury determined that $77,671.00 in damages was attributable to Castle’s failure to allow the Long Trusts to sell their banked gas during the same period. We do not believe these findings are supported by factually sufficient evidence. Nowhere in the various calculations made to assess damages is any consideration given to the value of the banked gas credited to the Long Trusts during the eleven-month period. The amounts found by the jury bear no resemblance to those asked by the Long Trusts during argument. The banked gas sold since the Long Trusts resumed taking their gas apparently has been sold at a higher price ($4.36-4.40/mcf) than it would have obtained during the period the Long Trusts claim they were prevented from marketing their gas ($1.80/ mcf-2.90 mcf). The evidence does not sup
 
 *282
 
 port the jury’s damage findings in answer to Questions No. 13 and No. 14.
 

 The jury found that Castle breached the GBA by failing to make a money settlement with the Long Trusts for their underproduced balances in the Kangerga “A” No. 1 well when its production permanently ceased. The provisions of the GBAs are “separately” applicable to each well and each reservoir to the end that production from one reservoir in a gas well may not be utilized for the purpose of balancing underproduction. TUMCO, the surface owner, bought the Kangerga “A” No. 1 well so that it could plug the well and mine its lignite on the site. Castle argues that it owes nothing to the Long Trusts because the agreement with TUM-CO paying the working interest owners $300,000.00 superseded all prior agreements pertaining to that well. We cannot agree that the agreement with TUMCO discharged the obligation of the other working interest owners to pay the Long Trusts for the banked gas referable to their underproduction from that well. The Long Trusts received $53,811.90 in the agreement with TUMCO, an amount proportionate to their working interest in the well. There is no evidence in the agreement that the Long Trusts received any added consideration for the imbalance resulting from past underproduction from this well. When Castle sold their interest to UPRC, they also transferred a banked gas balance due the Long Trusts for their underproduction from the Kangerga “A” No. 1.
 

 Castle breached the GBA by failing to reach a money balancing for the Kangerga “A” No. 1 when production ceased. The jury found damages for the breach of $49,231.00. This figure apparently does not reflect any value due the Long Trusts for the banked gas carried on UPRC’s books attributable to the Long Trusts underproduction from the Kangerga “A” No. 1 when it was plugged. We conclude the evidence is factually insufficient to support the finding.
 

 Breach of Implied Covenant
 

 In Question No. 1, the trial court asked the jury the following:
 

 Was there an implied covenant in the Gas Balancing Agreements that if the operator continues to fail and refuse, when requested, to allow an underpro-duced non-operator to sell and market its underproduced, banked gas, the operator must account to such underpro-duced non-operator by a complete money settlement for all under produced storage gas, as calculated by the terms and provisions for a monetary settlement in the Gas Balancing Agreements?
 

 Question No. 2D asked if the “failure of Castle ... to make a complete monetary settlement with the Long Trusts for all the underproduced balances in all the wells of the units is a breach of the implied covenant, if any, you have found in answer to Question No. 1.” Question No. 3 asked if Castle’s failure to comply with the JOAs constituted a repudiation of the agreement. Question No. 4 asked if the Long Trusts accepted Castle’s repudiation of the Gas Balancing Agreement. Question No. 16 asked the damages caused by the conduct found in response to Questions No. 2D and No. 4. The jury answered ‘Tes” to all the predicate questions and found $376,273.00 in damages. We find no basis in the agreement or conduct of the parties for the finding of an implied covenant nor the finding of repudiation; hence, the damage findings are irrelevant.
 

 Exculpatory Clause
 

 Castle attempts to entirely escape liability for breach of contract arguing that it cannot be held to have breached the
 
 *283
 
 JOAs absent proof that it was guilty of “gross negligence or willful misconduct,” the standard of care prescribed by the Article V.A. of the JOAs.
 
 [4]
 
 This clause, however, is limited to claims that Castle failed to act as a reasonably prudent operator in its operations in the contract area and does not apply to a claim that it otherwise breached the JOAs.
 
 See Abraxas Petroleum v.
 
 Hornburg, 20 S.W.3d 741, 752 (Tex.App.-El Paso 2000, no pet.).
 

 The Long Trusts’ Cross-Issues
 

 After the Long Trusts filed their lawsuit, Castle counterclaimed to recover the balance of the JIBs that the Long Trusts had not paid. The trial court rendered judgment for Castle based on the jury’s answers to the following questions:
 

 QUESTION NO. 33
 

 Was the failure, if any, of the Long Trusts to pay their share of the joint interest expenses, a failure to comply with the Joint Operating Agreements in question?
 

 Answer “Yes” or “No”.
 

 ANSWER: Yes
 

 QUESTION NO. 35
 

 What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Castle Texas Production Limited Partnership for its damages, if any?
 

 Consider the following element of damages, if any, and none other:
 

 The amount owed to Castle Texas Production Limited Partnership by the Long Trusts for their share of joint operating expenses under the Joint Operating Agreements.
 

 Do not add any amount for interest on damages, if any.
 

 Answer in dollars and cents.
 

 ANSWER $170,000.00
 

 In its final judgment, the trial court awarded Castle actual damages of $170,000, prejudgment interest in the amount of $73,998.90, and attorneys’ fees in the amount of $600,000.00, plus additional attorneys’ fees on appeal.
 

 In its first issue presented, the Long Trusts contend that the trial court erred in disregarding the jury’s verdict in answer to Questions No. 26 and 27. In its answers to the two questions, the jury found that Castle failed to provide reasonable notice to the Long Trusts of its intention to dispose of the “collateral.” The collateral is described in the questions as “[t]he Long Trusts’ monthly share of gas production and monthly allotment of underpro-duced banked gas during the time period between March 1996 and February 1997 and the Long Trusts’ monthly share of condensate during the time period between December 1992 and May 1997.”
 
 [5]
 
 In its answer to Question No. 27, the jury found that Castle failed to apply the proceeds of the sales of the “collateral” to the
 
 *284
 
 satisfaction of the Long Trusts’ indebtedness under the JIBs.
 
 [6]
 

 The Long Trusts maintain that these and other findings establish that Castle should not recover against the Long Trusts for its failure to pay the JIBs. The Long Trusts argue as follows:
 

 By reason of Texas Business and Commerce Code §§ 9.504 and 9.515 (App.3) (pre-July, 2001 amendments) and the
 
 Tanenbaum v. Economics Laboratory, Inc.,
 
 628 S.W.2d 769 (Tex.1982) doctrine, there is a conclusive presumption that by Castle’s retaining and selling the Long Trusts’ share of production of gas from March 1, 1996 to February 1, 1997 and Castle’s selling the Long Trusts’ share of condensate each month from 1992 to 1997, without Castle giving notice to the Long Trusts-, without applying the proceeds to the indebtedness and not accounting to the Long Trusts for their share of surplus from such sales, Castle retained such collateral in full satisfaction of the Long Trusts’ indebtedness and no deficiency could be owing to support the relief which the District Court granted Castle.
 

 Tanenbaum
 
 held that if a secured creditor does not first comply with those sections of the Business and Commerce Code providing for notice to the debtor regarding the disposition of the collateral and mandating a commercially reasonable disposition of the collateral, it cannot sue for any deficiency remaining after disposition of the collateral.
 
 Tanenbaum,
 
 628 S.W.2d at 772.
 

 Castle insists that the trial court did not err in disregarding the jury’s answer to Questions No. 26 and 27 because the Long Trusts made no effort to secure a jury finding that Castle treated the Long Trusts’ share of production as collateral, and neither the evidence nor the controlling agreements (the JOAs) conclusively established that Castle treated the Long Trusts’ share of production as collateral for the unpaid JIBs. Instead, Castle argues, the court submitted, over Castle’s objection, Questions No. 26 and 27, which erroneously assumed and improperly relied on the assumption that Castle treated the gas and condensate as collateral.
 

 Castle acknowledges that the JOA gave it the right to act as a secured creditor under the Texas Business and Commerce Code, but emphasizes that it never exercised that right until it notified Enron of its lien rights to gas sales by the Long Trusts in February 1997. It insists Article VIL B. of the JOAs was not the only contractual provision giving it the right to sell the gas and condensate produced from the wells. Castle contends that it and the other working interest owners took the gas
 
 *285
 
 pursuant to the GBAs which are automatically effective whenever a working interest owner or its purchaser is unable to take its share of gas production. The GBAs specified that when the other working interest owners sell gas pursuant to the GBAs, they are deemed to own all of the gas they take and sell, including that portion that would otherwise belong to the working interest owner who cannot or will not market its gas, or whose purchaser cannot take its share.
 
 [7]
 
 But the party unable to market its share must be credited with gas in storage equal to its share.
 

 Castle maintains that it and the other working interest owners took and sold the Long Trusts share of production under this section of the GBAs and that, obedient to its provisions, it credited the Long Trusts with gas in storage equal to its share of the gas produced.
 

 Castle asserts it sold condensate, not as collateral, but under the provisions of Article VI. C. of the JOAs that gave the operator the right to sell that share of production for a party that has failed to arrange to take its share of the oil and gas in kind or separately dispose of it.
 
 [8]
 
 Castle maintains that since the Long Trusts never arranged to sell their share of the condensate and never notified Castle that they wanted to start taking their share of the condensate, it exercised its right as operator to sell the condensate, not as collateral, but under Article VI. C. of the JOAs.
 

 Although Article VII. B. of the JOAs gave Castle a security interest in production, it did not require Castle to exercise its rights upon default. The JOAs also gave the operator, Castle, other contractual rights to dispose of the gas and condensate in the event the non-operator was unable to take its share. The GBAs provide for the sale of gas by the other working interest owners when one or more of the working interest owners or their purchasers were unable to take their share. Article VT. C. of the Joint Operating Agreements provided for the sale of the condensate when the Long Trusts had no market. Default under the security agreement granted in Article VIL B. did not abrogate Castle’s right to market the gas and condensate under these other contractual provisions. The Business and Commerce Code recognizes that the secured party is not automatically required to exercise its security interest upon default, but “after default
 
 may
 
 sell, lease or otherwise dispose of any or all of the collateral.”
 
 See
 
 Tex. Bus. & Comm.Code Ann. § 9.504(a)
 
 *286
 
 (Vernon 1991) (emphasis added).
 
 [9]
 
 The evidence shows that when the gas production attributable to the Long Trusts was sold by Castle and the other working interest owners, pursuant to the GBAs, the Long Trusts were regularly credited with banked gas to compensate for their inability to take their share. There is evidence that the Long Trusts received some payments for condensate while other monies were held in suspense. This is consistent with the sale of the condensate, not as collateral, but as authorized by Article VI. C. of the JOAs. Neither the evidence nor the controlling agreements conclusively establish that Castle sold or retained the Long Trusts’ share of production as collateral for the Long Trusts’ unpaid JIBs. Although Questions No. 26 and 27 assume the sale of the gas and condensate as collateral, this was not justified in the absence of a specific finding that the gas and condensate were sold as collateral.
 

 The Long Trusts contend that the award of damages to Castle for the unpaid JIBs is fundamentally in conflict with the remainder of the amended final judgment. The Long Trusts point out that in its verdict, and specifically in its answer to Question No. 7, “the jury found that Castle Texas Production Limited Partnership converted the Long Trusts’ share of gas production and allotments of underpro-duced banked gas by (5) not applying the proceeds to the Long Trusts indebtedness and paying the Long Trusts any surplus.” The Long Trusts argue that by finding that Castle breached the JOAs and converted the Long Trusts’ share of production, the jury necessarily determined that
 
 *287
 
 Castle was selling the Long Trusts’ share of production as collateral under Article VII. B. of the JOAs.
 

 The jury questions bearing most directly on this issue (Questions No. 7(5) and 8(5)) were submitted over Castle’s objections. The trial court also submitted the following instruction in Questions 7 and 8:
 

 You are instructed that the terms of the JOAs and the Gas Balancing Agreements do not provide the operator with the remedy of withholding a non-operator’s share of production or treating the non-operator’s share of production as “banked” gas, where the non-operator gives the operator notice that it desires to begin taking or delivering its share of production. The JOAs only permit the operator to enforce a lien against the non-operator’s share of production (the “Collateral”) pursuant to its rights as a secured party, which includes either its retention of the gas in full satisfaction of the indebtedness or conducting a foreclosure sale after reasonable notice in a commercially reasonable manner and accounting for the proceeds by applying the proceeds to satisfaction of the indebtedness, or under the JOAs, the operator may collect the proceeds of sales from the non-operator’s purchasers.
 

 The trial court erred in submitting this instruction because contrary to the governing agreements, it assumed that the proceeds from the gas and distillate sales had to be applied to the Long Trusts’ indebtedness. Therefore, the instruction misstates a crucial provision of the GBAs.
 

 We agree with Castle that the instruction attributed to the Long Trusts contractual rights they did not have and deprived Castle of its defenses based on those contractual provisions. Its prejudicial effect was demonstrated by the closing argument of the Long Trusts’ counsel in which he relied on the first part of the instruction, telling the jury that the trial court’s instruction “dispose[d]” of Castle’s “entire defense ... [in] one sentence.” “An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting, as it was in the present case.”
 
 Quantum Chem. Corp. v. Toennies,
 
 47 S.W.3d 473, 480 (Tex.2001). The nature of the error and the use made of it was so egregious as to not only taint the findings in those questions, but to also impart the same infirmity to the other findings. The jury’s findings in answer to Questions No. 26 and 27 do not serve to defeat Castle’s claim.
 

 The jury awarded Castle $170,000.00 as damages for the unpaid JIBs. The total of all the JIBs submitted to the Long Trusts was $172,951.73. The Long Trusts, the evidence showed, was entitled to a credit of $23,000.00 for payments withheld by Castle. The Long Trusts points out that Castle in its First Amended Original Counterclaim, swore to damages of $149,407.99. The evidence supports no more than $149,407.99 in damages, and we suggest a remittitur of $20,592.01.
 

 Attorneys’ Fees for Counterclaim
 

 Castle’s attorney testified that, taking into consideration the eight factors set out in Texas Disciplinary Rule of Professional Conduct 1.04, a reasonable and necessary attorneys’ fee for all services rendered in the trial court was $600,000.00. He also testified that he spent 75% of his time on the counterclaim and matters inseparably intertwined with it. Castle sought to recover 75% of $600,000.00 as attorneys’ fees. The jury, however, found that a reasonable fee for Castle’s pursuit of the counterclaim was $600,000.00. Castle acknowledged that there was no support in the record for more than $450,000.00.
 
 *288
 
 Castle requested a remittitur of $150,000.00, but the trial court’s plenary-power expired before it could act on Castle’s remittitur request. Castle renews its request for a $150,000.00 remittitur to this court.
 

 The Long Trusts contend that although there is testimony that $600,000.00 is a reasonable fee for handling Castle’s entire case, there is no evidence that $450,000.00 is a reasonable and necessary fee for handling the collection of an account one-third the size of the attorneys’ fees. We conclude that counsel for Castle sufficiently segregated the legal expenses for prosecuting the counterclaim from the legal expenses for the entire case by indicating that 75% was attributable to the counterclaim. “[W]hat a reasonable attorney’s fee would be for the entire case indicates what the segregated amounts should be.”
 
 Stewart Title Guar. Co. v. Sterling,
 
 822 S.W.2d 1, 12 (Tex.1991).
 

 The Long Trusts also contend the fee awarded Castle on its counterclaim was excessive for what they characterize as hardly more than a simple suit on a sworn account. The record shows, however, that Castle’s attempt to collect on the JIBs was hardly a simple manner. It is surely a rare case where the attorneys’ fees are three times the recovery. But the size of the recovery is only one of the factors under Disciplinary Rule of Professional Conduct 1.04. There was evidence that $450,000.00 was a necessary and reasonable fee. The determination of reasonable attorneys’ fees is a question for the trier of fact.
 
 Id.
 
 The jury’s verdict, however, awarded Castle $150,000.00 more than the evidence showed and $150,000.00 more than that sought by Castle. Therefore, we suggest a remittitur of $150,000.00 in the attorneys’ fees given Castle in the judgment.
 

 Counterclaim Pre-Judgment Interest
 

 In its issue 11C., Castle complains that the trial court erred in failing to award the correct amount of prejudgment interest on its counterclaim. The JO As in Exhibit C4 specify that if the joint interest billings are not paid within fifteen days of receipt, “the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws.... ” It is apparent that the amount of prejudgment interest was not so calculated, and the claim must be remanded for the recalculation of the prejudgment interest.
 

 Conclusion
 

 The major part of the Long Trusts’ case was submitted on the wrong theory. The record supports the jury’s findings that Castle breached the JOAs. There is, however, insufficient evidence supporting most of the jury’s damage findings. Therefore, there is an insufficient basis for an alternate judgment. 'Moreover, we are of the opinion that the interest of justice would be better served if all aspects of the Long Trusts’ breach of contract case were tried together. The judgment in favor of the Long Trusts against Castle Texas Production Limited Partnership, Castle Texas Pipeline Limited Partnership, CEC Gas Marketing Limited Partnership, and Castle Energy Corporation is reversed and the cause remanded to the trial court.
 

 If within fifteen days after this court’s opinion, Castle files in this court a remitti-tur of $20,592.01 of the damages and $150,000.00 in attorneys’ fees awarded in the judgment against the Long Trusts, then and in that event, the trial court’s judgment, awarding Castle damages and attorneys’ fees will be affirmed as to $149,407.99 in damages and $450,000.00 in attorneys’ fees, and the cause of Castle against the Long Trusts will be severed
 
 *289
 
 and remanded to the trial court only for the re-calculation of the prejudgment interest on damages at the rate and in the manner provided by the JOAs. In the event the suggested remittiturs are not timely filed, that part of the judgment awarding damages, prejudgment interest, and attorneys’ fees to Castle will be reversed and the cause remanded unsevered to the trial court for new trial.
 

 JUDGMENT
 

 THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being inspected, it is the opinion of this Court that there was error in the judgment of the trial court below insofar as the award of judgment in favor of the Long Trusts against Castle Texas Production Limited Partnership, Castle Texas Pipeline Limited Partnership, CEC Gas Marketing Limited Partnership, and Castle Energy Corporation which such judgment is REVERSED and the cause REMANDED to the trial court.
 

 It is further the opinion of this Court that the award of judgment in favor of Castle Texas Production Limited Partnership against the Long Trusts in the amount of $170,000.00 in actual damages and $600,000.00 in attorneys’ fees is excessive and that in order to obtain an affir-mance of said judgment, Castle Texas Production Limited Partnership must file a remittitur in the amount of $20,592.01 of the damages and $150,000.00 of the attorneys’ fees; and it appearing that Castle Texas Production Limited Partnership has timely filed such remittitur, it is the opinion of this Court that the judgment in favor of Castle Texas Production Limited Partnership against the Long Trusts as reduced be reformed and, as reformed, affirmed.
 

 It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below is reformed to provide that Castle Texas Production Limited Partnership recover of and from the Long Trusts the sum of $149,407.99 in actual damages and $450,000.00 in attorney’s fees, and that the judgment in favor of Castle Texas Production Limited Partnership against the Long Trusts AS REFORMED, IS AFFIRMED; that all costs in this cause expended both in this Court and the court below be assessed against the Long Trusts, for all of which let execution issue; and that this decision be certified to the court below for observance.
 

 [1]
 

 . Larry T. Long, Sammy Adamson, and Allan Long filed suit as Trustees for the Lawrence Allan Long Trust, the Charles Edward Long Trust, the Larry Thomas Long Trust, and the John Steven Long Trust.
 

 [2]
 

 . The GBA includes the following language: "The provisions of this exhibit shall be separately applicable to each well and each reservoir to the end that production from one reservoir in a gas well may not be utilized for the purpose of balancing underproduction.”
 

 [3]
 

 . The Dallas Court of Appeals, in an opinion affirmed by the supreme court, has stated that the supreme court has made it clear that its holding in
 
 Formosa
 
 is limited to claims of fraudulent inducement.
 
 Yzaguirre v. KCS Resources, Inc.,
 
 47 S.W.3d 532, 543 (Tex.App.-Dallas 2000),
 
 aff'd,
 
 53 S.W.3d 368 (Tex.2001) (citing
 
 D.S.A., Inc.,
 
 973 S.W.2d 662, 663 (Tex.1998)).
 

 [4]
 

 . The JOAs provide as follows:
 

 [Operator] ... shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.
 

 [5]
 

 . QUESTION NO. 26
 

 Did Castle Texas Production Limited Partnership fail to provide reasonable notice to The Long Trusts of its intention to dispose of the collateral (The Long Trusts’ monthly share of gas production and monthly allotment of underproduced, banked gas during the time period between March 1996 and February 1997 and The Long Trusts’ monthly share of condensate during the time period between December 1992 and May 1997)?
 

 [6]
 

 . QUESTION NO. 27
 

 Did Castle Texas Production Limited Partnership fail to apply the proceeds of sales of the collateral (The Long Trusts' monthly share of gas production and monthly allotment of underproduced, banked gas during the time period between March 1996 and February 1997 and The Long Trusts' monthly share of condensate during the time period between December 1992 and May 1997) in the following manner:
 

 (1)The reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys’ fees and legal expenses incurred by the secured party;
 

 (2) The satisfaction of indebtedness secured by the security interest under which the disposition is made;
 

 (3) The satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed;
 

 (4) Any surplus to The Long Trusts.
 

 Answer "Yes” or "No”.
 

 ANSWER:
 
 Yes
 

 [7]
 

 . During the period or periods when any party hereto has no market for, or its purchaser is unable to take its share of gas, the other parties shall be entitled to produce each month one hundred percent (100%) of the allowable gas production.... All parties hereto shall share in and own for condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with gas in storage equal to its share of the gas produced, less its share of gas used in lease operations, vented or lost. (Emphasis added).
 

 [8]
 

 . In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. (Emphasis added).
 

 [9]
 

 . Tex. Bus. & Comm.Code Ann. § 9.504 provides in pertinent part as follows:
 

 (a) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the chapter on Sales (Chapter 2)....
 

 (b) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency.
 

 (c) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.... The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.
 

 Tex. Bus. & Comm.Code Ann. § 9.505 provides in pertinent part as follows:
 

 (b) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notices shall be given to any other secured party who has a security interest in the same collateral and who has duly filed in the office of the Secretary of State or the County Clerk ... a financing statement indexed in the name of the debtor or from whom the secured party has received (before sending his notice to the debtor or before the debtor’s renunciation of his rights) written notice of a claim of an interest in the collateral.
 

 Tex Bus. & Comm.Code Ann. § 9.505(b) (Vernon 1991).