Wendell **REEDER**, Appellant

v.

**WOOD COUNTY ENERGY L.L.C., Wood County Oil & Gas, Ltd., Nelson Operating, Inc., Dekrfour, Inc., Bobby Noble, Exzena Oil Corporation, David Fry and Patricia Fry, Appellees.**

No. 12–08–00175–CV.

Court of Appeals of Texas, Tyler.

July 14, 2010.

Rehearing Overruled Sept. 16, 2010.

---

436

J. Bennett White, Tyler and Christopher T. Massey, for Wendell Reeder.

Jay J. Madrid, Dallas, Laurie C. Jardine and Gregory D. Smith, for Wood County Energy, LLC.

Marcus A. Carroll, Tyler and Gregory D. Smith, for David Fry, Nelson Operating, Exzena Oil Corporation, Inc., Dekrfour, Inc. and Bobby Noble.

Laurie C. Jardine, Jay J. Madrid, Dallas and Gregory D. Smith, for Wood County Oil & Gas, Ltd.

James Wade, pro se.

Sam B. Cobb, Tyler, for East Texas Producers & Royalty Owners Association, Woodbine Production Corporation, M–C Production & Drilling Co., Inc., TMR Exploration, Inc., The Long Trusts, The Genecov Group, Inc., Southwest Operating Co., Inc., Atlantis Oil Co. and Ridge Petroleum.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

### OPINION ON REHEARING

JAMES T. WORTHEN, Chief Justice.

Wendell Reeder has filed a motion for rehearing, which is overruled. We withdraw our opinion of April 28, 2010 and substitute the following opinion in its place.

This is a breach of contract case arising out of competing claims to certain interests in an old oil field. Following a jury trial, the trial court rendered a judgment

against Wendell Reeder. The judgment awarded Patricia Fry $7,500.00 plus pre-judgment interest. The judgment also awarded Dekrfour, Inc., Nelson Operating, Inc., Bobby Noble, and Wood County Oil and Gas, Ltd. $872,493.25 plus prejudgment interest, along with $125,000.00 in attorney's fees plus prejudgment interest. Reeder raises seventeen issues challenging the trial court's conclusion that he is bound by a 1996 joint operating agreement, the jury's findings that he breached the joint operating agreement, and the jury's award of damages, attorney's fees, and prejudgment interest. We modify the damage awards and prejudgment interest awards in part, suggest a partial remittitur of attorney's fees, and affirm the judgment as modified.

## BACKGROUND

The Forest Hill Field Sub–Clarksville Unit was created in 1965, and the Forest Hill Field Harris Sand Unit was created in 1975. The two units overlapped, and oil was being produced from both. In 1995, Dekr, Inc. purchased the working interest in the Forest Hill Field and transferred it to Dekrfour, Inc. ("Dekrfour"). David Fry owned both companies.

In 1996, Dekrfour and Secondary Oil Corporation, Inc. entered into a mutual agreement regarding Dekrfour's sale of an 85% working interest to Secondary. The interest was limited to the Harris Sand formation, and to specific wells within the Harris Sand Unit. Dekrfour retained a 15% carried working interest. The mutual agreement became part of a joint operating agreement ("JOA") that Dekrfour and Secondary executed eleven days later. Pursuant to the JOA, Dekrfour, Second-

ary, and Secondary's sister corporation would share the existing wellbores in the production of the Sub–Clarksville and Harris Sand Units.[1] Dekrfour transferred the 85% working interest to Secondary as agreed, and also transferred a 10% carried working interest in the same formation and wells to Nelson Operating, Inc., another of David Fry's companies. In the same document, Dekrfour transferred its interest in all other formations in these wells to Nelson.

In 1998, Reeder became operator of the Harris Sand Unit when he and Don Dacus purchased 87.5% of the working interest in the unit wells previously transferred to Secondary. Dekrfour and Nelson collectively owned a 12.5% carried working interest in the Harris Sand Unit. Reeder acquired Dacus's share of the working interest after Dacus died. In May 2004, Reeder formed a limited partnership, Wood County Oil and Gas, Ltd. ("Wood County Oil") in which Reeder and James Wade each owned 45% and Hattie Scherbach owned 10%. Reeder, who had no prior experience in oilfield operations, continued to maintain from 1998 forward that he was the operator of the Harris Sand Unit.

From 1998 forward, Reeder's relationship with David Fry and his companies gradually developed into an adversarial one. In April 2003, Bobby Noble purchased a portion of Dekrfour's and Nelson's Sub–Clarksville interest. Beginning in 2003, however, Reeder refused to allow Dekrfour, Nelson, and Noble (collectively, the "Fry Interests") to use any of the wellbores he controlled to produce from the Sub–Clarksville Unit.[2] Consequently,

1. The existing wellbores could be used to produce from either unit, but only from one unit at a time.

2. Noble was aligned with Dekrfour and Nelson throughout the trial, and we will include him with them when we refer to the Fry Interests in this opinion.

from 2003 forward, the Fry Interests were unable to develop new production out of the Sub–Clarksville Unit. By the summer of 2006, the Texas Railroad Commission had sealed wells and severed the pipeline from the Harris Sand Unit. In an August 8, 2006 letter to Wade and Scherbach, Reeder stated that he was "prepared to engage necessary services from appropriate geologists and others to accomplish the repairs to get the pumping wells unsealed and the severance released." But he did nothing. By September 2006, all production had ceased in the Harris Sand Unit. Because oil was not produced from the Harris Sand Unit in paying quantities, the unit expired, and the leases not held by production from other zones were lost.

### LITIGATION REGARDING INTERESTS

In May 2004, Reeder filed a suit against the Fry Interests asserting that he was the operator of certain wells in the Harris Sand Unit and that he had the exclusive right to possession of the wellbores for the purpose of producing oil from them. David and Patricia Fry were also named as defendants. Later, Wood County Oil and Gas, Ltd. and its general partner, Wood County Energy, L.L.C. (collectively "Wood County") joined Reeder's suit as plaintiffs seeking damages in connection with those wells. Reeder and Wood County contended that they had the exclusive right to produce from the Harris Sand Unit, they retained the right to the wellbores to the exclusion of the Fry Interests, and that the Fry Interests had interfered with those rights. Reeder and Wood County further alleged that the Fry Interests had unlawfully converted production from the Harris Sand Unit; committed trespass, conversion, and theft; and wrongfully dispossessed Reeder and Wood County of their property, causing damage to the existing wells in the process. Reeder and Wood County sought damages and a declaratory judgment that the Fry Interests had no right to interfere with the wellbores or with Reeder's rights as operator. They also sought an injunction to keep the Fry Interests from interfering with their right to possession of the wells in question.

The Fry Interests filed a cross-action against Reeder and Wood County relating to the same wells. They alleged that Reeder, as successor in interest under the assignment of the JOA, had breached the JOA. Additionally, the Fry Interests alleged that Reeder failed to produce the unit in paying quantities and that Reeder had converted their personal property. In addition to damages, they sought a declaratory judgment specifying their rights to develop the Sub–Clarksville Unit, rescinding the JOA, and determining the title issues involving Wood County. Patricia Fry alleged that she had previously operated some of the wells and had been fined by the Texas Railroad Commission because Reeder had failed to file a document required by the Commission.

Later, Wood County switched sides and asserted that if the Fry Interests suffered any damages, those damages were caused by Reeder in his capacity as operator of the Harris Sand Unit. Wood County then filed a cross-claim against Reeder for all damages that it might have suffered as a result of his actions as operator. Further, Wood County sued Reeder for any damages suffered as a result of any lost leases and loss of the unit. Wood County nonsuited its claims against the Fry Interests, although it continued to seek a declaratory judgment regarding its ownership interest.

After a trial before a jury, the trial court signed its final judgment ordering that Reeder take nothing and declaring that Reeder owns no mineral interest in the leases covering the former Harris Sand

Unit or the former Sub–Clarksville Unit. The trial court ordered Reeder to pay Patricia Fry $7,500.00 plus prejudgment interest for his failure to file the document with the Railroad Commission. The trial court further ordered that the Fry Interests and Wood County Oil recover actual damages from Reeder totaling $872,493.25, plus prejudgment interest. Reeder was also ordered to pay $125,000.00 in attorney's fees, plus prejudgment interest. Reeder timely appealed the damage awards against him.

### SUFFICIENCY OF THE EVIDENCE

In his first ten issues, Reeder maintains that the evidence is insufficient to support the jury's findings that he breached the JOA by failing to maintain production and by failing to offer Well No. 116 back to the nonoperators before he plugged it.

### Standard of Review—Legal Sufficiency

When the appellant is challenging the legal sufficiency of the evidence to support a finding on which he did not have the burden of proof at trial, the appellant must demonstrate on appeal that no evidence exists to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In reviewing for legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex.2008). The test for legal sufficiency "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [fact finder] to reach the [result] under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Legal sufficiency review must credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id.*

We sustain a legal sufficiency challenge when the record discloses one of the fol-lowing situations: (1) there is a complete absence of evidence establishing a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998). Anything more than a scintilla of evidence is legally sufficient to support the finding. *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002).

The fact finder is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *City of Keller*, 168 S.W.3d at 819. Reviewing courts must assume that the fact finder decided all credibility questions in favor of the verdict, crediting testimony favorable to the verdict and disbelieving testimony contrary to it if a reasonable person could do so. *Id.*

### Standard of Review—Factual Sufficiency

If a party is attacking the factual sufficiency of the evidence to support an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex.App.-Austin 1992, no writ). In addressing a factual sufficiency of the evidence challenge to a jury verdict, an appellate court must consider and

weigh all of the evidence. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.; Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). However, this court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Durban v. Guajardo,* 79 S.W.3d 198, 208 (Tex.App.-Dallas 2002, no pet.); *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

### Applicability of JOA to Reeder

 In his first and sixth issues, Reeder contends that the JOA did not apply to him as the operator because he was not a successor to the operator designated in the 1996 agreement and therefore he did not owe any duties under the JOA. He does not challenge the validity of the JOA. He concedes that he received a copy of the JOA when he became operator in 1998 but argues that it applied only to the original parties who signed the agreements in October 1996. We disagree.

David Fry testified that until 1996 he owned the entire working interest in both units. He stated that when he sold an interest to Secondary in 1996, he and Secondary were required by the 1965 Sub–Clarksville unit agreement and the 1975 Harris Sand unit agreement to execute a JOA.[3] The recorded unit agreements for both the Sub–Clarksville Unit and the Harris Sand Unit included the following clauses:

> 1.9 *Unit Operating Agreement,* shall mean an Agreement (together with all amendments thereof) to be executed by and between the Working Interest Own-

ers covering the operations on the Unit Area for the production of Unitized Substances from the Unitized Formation, which said Agreement will be executed promptly after more than one Working Interest Owner becomes a party to this Agreement.

> 4.1 *Unit Operator.* Unit Operator shall have the exclusive right to conduct Unit Operations. The operations shall conform to the provisions of this agreement and the Unit Operating Agreement, if executed. If there is any conflict between such agreements, this agreement shall govern.

> 13.1 *Agreement is a Covenant.* All of the terms and provisions of this agreement shall extend to, be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns of the parties hereto, and shall constitute a covenant running with the lands, leases and interests covered hereby.

The JOA specifically states that it is "binding upon and shall insure [sic] to the benefit of the parties, their heirs, successors and assigns forever, continuing in full force and so long as the subject leases remain intact." The mutual agreement between Dekrfour and Secondary was incorporated into the JOA and also states that it "shall be binding on and inure to the benefit of the parties to this Agreement and their respective heirs, successors, and permitted assigns." An operating agreement is typically in effect for as long as any of the oil and gas leases subject to the JOA remain in effect. *See* ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 17.3(A)(1) (2009). A successor operator is bound to the terms of the operating agreement un-

---

**3.** Documents in the record show that Dekrfour owned the working interest transferred to Secondary. Fry owned Dekrfour and signed various documents as president of Dekrfour.

der which he is chosen, even though he is not familiar with the provisions and would not have intended to accept some of the provisions. *Id.* at § 17.3(F)(1).

Reeder acknowledged receiving the JOA. Reeder also acknowledged in writing to the parties in this lawsuit, on three separate occasions, that he was the operator. In his suit filed in May 2004 against the Fry Interests, he described himself as the "designated and official operator" of the Forest Hill Harris Sand Unit. In June 2005, Reeder sent a letter to the attorney for Wade and Scherbach stating that he was the operator of the Forest Hill Harris Sand Unit. In the previously quoted August 2006 letter sent to Wade and Scherbach referencing the Forest Hill Harris Sand Unit, he included a caption across the top that emphatically stated "**WEN-DELL REEDER OPERATOR.**" Further, as we discuss later in this opinion, Reeder attempted to avail himself of the exculpatory clause in the JOA.

■ Ratification of a JOA occurs when the operator recognizes its validity by acting and performing under its terms, as well as affirmatively acknowledging it. *See Stable Energy, L.P. v. Newberry,* 999 S.W.2d 538, 547 (Tex.App.-Austin 1999, pet. denied). The record before us is replete with instances of Reeder's exercising the managerial authority given to the operator under the terms of the JOA.

■ Further, the doctrine of quasi-estoppel precludes a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Fasken Land & Minerals, Ltd. v. Occidental Permian, Ltd.,* 225 S.W.3d 577, 593 (Tex.App.-El Paso 2005, no pet.); *Newberry,* 999 S.W.2d at 548. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he

acquiesced, or under which he accepted a benefit. *Newberry,* 999 S.W.2d at 548. Here, Reeder accepted the benefits and authorities of being the unit operator provided to him under the JOA. We hold that he ratified the JOA and is estopped from asserting that he was not bound by it. Thus, the evidence is legally and factually sufficient to prove that Reeder is bound by the JOA. We overrule Reeder's first and sixth issues.

### Exculpatory Clause in JOA

■ In several of his issues, Reeder attacks the jury's affirmative answers to Questions 8 and 18 that he breached his duty to the Fry Interests and Wood County Oil. Due to the language of the jury charge, we must determine the effect of the exculpatory clause before we can address the sufficiency of the evidence complaints presented. The jury was given the same instructions for both questions:

> You are instructed that the joint operating agreement requires the Operator to conduct operations in a good and workmanlike manner. A good and workmanlike manner requires the operator to act as "a reasonably prudent operator."

> You are further instructed that the Operator is not liable under this standard unless Operator's conduct amounts to gross negligence or willful misconduct.

> You are further instructed that "gross negligence" means that entire want of care which would raise the belief that the act or omission complained or [sic] was a result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

Because the jury was instructed that his conduct must rise to the level of gross negligence or willful misconduct, Reeder argues that the findings cannot stand because the evidence does not show that he

committed gross negligence or willful misconduct. The "gross negligence or willful misconduct" language was apparently lifted from what is known as the exculpatory clause in the JOA:

> 3. [Operator] shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement.... Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and in accordance with good oilfield practice, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

We have previously interpreted a similar exculpatory clause which reads, in relevant part, as follows:

> [Operator] ... shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

*Castle Tex. Prod. Ltd. P'ship v. Long Trusts,* 134 S.W.3d 267, 283 n. 4 (Tex.App.-Tyler 2003, pet. denied). There, we held that this exculpatory clause was limited to claims that the operator failed to act as a reasonably prudent operator in its operations in the contract area and did not apply to a claim that it otherwise breached the JOAs. *Id.* at 283. Although the exculpatory clause under which Reeder operated includes the phrase "its activities under this agreement as a reasonable prudent operator," the exculpatory clause is located within the paragraph describing "operations on the contract area" as the exculpatory clause was in *Long Trusts. See id.* We see no meaningful difference between the two exculpatory clauses. The complaints made against Reeder pertain to his alleged breaches of the JOA. Therefore, we hold that the JOA's exculpatory clause does not apply to the claims addressed by Questions 8 and 18.

During the charge conference held before the court submitted the charge to the jury, the Fry Interests and Wood County objected to the gross negligence and willful misconduct instruction being submitted to the jury, contending this was a breach of contract case. The trial court overruled that objection. As we have discussed above, the standards of care provided in the exculpatory clause do not apply to what this case was all about—a breach of contract. Thus, the gross negligence and willful misconduct instruction should not have been included in the charge.

■■■ To preserve a complaint that an instruction in a charge is defective, the party who does not rely on the instruction need only object. *First Valley Bank of Los Fresnos v. Martin,* 144 S.W.3d 466, 475 (Tex.2004) (Wainwright, J., concurring). An objection is sufficient to preserve error in a defective instruction. A request of substantially correct language is not required. *Id.* Because the trial court submitted improper instructions that were properly objected to, we measure the legal and factual sufficiency of the evidence supporting the jury's findings on Questions 8 and 18 against the elements of breach of contract, not gross negligence and willful misconduct. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 530 (Tex.2002). Those elements are (1) the existence of a valid contract; (2) performance or ten-

dered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 86 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

### Obligation to Maintain Production of Units

In issues two through five, Reeder contends the evidence is legally and factually insufficient to support the jury's answer to Question 8 that he breached his duty as operator by failing to maintain production in paying quantities or other operations in the Forest Hill Field. He argues that he owes no duty to the Fry Interests to carry leases or maintain production because, although Dekrfour and Nelson classified their interest as a carried working interest, their interest bears none of the costs of production and "in reality they are owners of an overriding royalty." He argues that an overriding royalty interest is carved out of the working interest, is nonparticipating, and is wholly dependent on the lessee to keep the lease alive. Accordingly, he asserts that he has no duty to keep the overriding royalty alive and where there is no duty, there can be no breach. He also argues that the failure to maintain production in paying quantities or to maintain other operations in the Forest Hill Field was due to the fact that Wade, Scherbach, and Wood County Oil would not invest more funds, rather than because of any breach on his part. He asserts that the only way for him to be responsible for allowing production to lapse is to find that he had a duty under the JOA to consume his own resources to keep the lease alive. He argues that he had no such duty and that he could not afford to contribute more of his personal funds. Thus, he claims the evidence does not support a finding that he failed to act as a reasonable prudent oper-

ator or that he acted with gross negligence or willful misconduct.

### Analysis

Reeder's contention that Dekrfour and Nelson owned an overriding royalty is contrary to the language of the unit agreement and the JOA. "Working interest" is defined in the unit agreement as including a carried interest. The unit agreement specifically allows a carried working interest to be created by a JOA. The mutual agreement specifically created a carried working interest for Dekrfour in the Harris Sand Unit.

An oil and gas royalty is a share of the product or profit from real property, reserved by the grantor of a mineral lease in exchange for the lessee's right to mine or drill on the land. Black's Law Dictionary 1445 (9th ed.2009). "Royalty" is commonly defined as the landowner's share of production, free of expenses of production. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex.1996). The oil and gas working interest is the right to the mineral interest granted by an oil and gas lease, so called because the lessee acquires the right to work on the leased property, search, develop, and produce oil and gas, as well as the obligation to pay all costs. Black's Law Dictionary at 1745. A "carried interest" in an oil and gas lease is a fractional interest that is free of some or all costs of exploring, drilling, and completing the well. *Id.* at 885.

The royalty interest is part of the lessor's interest in an oil and gas lease. A carried working interest is part of the lessee's interest in an oil and gas lease. Reeder has cited no authority for his proposition that the carried working interest here must be treated the same as an overriding royalty interest. Because the terms of the unit agreement permit, and the mutual agreement specifically created, a

carried working interest as part of the working interest in the Harris Sand Unit, Reeder cannot prevail on his argument that he owes no duty to Dekrfour and Nelson because they are actually owners of an overriding royalty interest.

The mutual agreement that was incorporated into the JOA specifically states that the operator "agrees to produce and/or conduct operations on the Harris Sand Unit sufficient to maintain the leases and the unit." The evidence shows that Reeder had no production from the Harris Sand Unit from September 2006 forward and that production had begun declining precipitously in the preceding months. Reeder presented no evidence of any actions he undertook or other operations he attempted that would maintain the leases and the unit. David Fry testified that the Fry Interests had been unable to achieve more production in the Sub–Clarksville Unit because of Reeder's refusal to allow them access to the jointly owned wellbores as required by the JOA. This is some evidence that Reeder did not maintain production in paying quantities or take the necessary actions required to maintain the leases and the unit. By his inaction, Reeder breached his duty under the explicit terms of the JOA to maintain production and/or conduct operations sufficient to maintain the leases and the unit. Thus, Reeder's challenge to the legal sufficiency of the evidence to support the jury's finding to Question No. 8 is without merit. *See Cazarez*, 937 S.W.2d at 450.

■ Reeder testified that he maintained production in the Harris Sand Unit as long as he could before he had to spend his money on other pressing business interests that he owned, which caused him to give up on maintaining production in pay-

ing quantities in the Harris Sand Unit. Contractual obligations cannot be avoided simply because the obligor's performance has become more economically burdensome than anticipated. *Huffines v. Swor Sand & Gravel Co.*, 750 S.W.2d 38, 40 (Tex.App.-Fort Worth 1988, no writ). The evidence shows Reeder failed to maintain production in paying quantities, a breach of the JOA by Reeder. Having other pressing financial matters to attend to does not excuse Reeder's failure to comply with the terms of the JOA. Further, Reeder never attempted operations in the contract area that would have required Wade or Scherbach to authorize expenditures under the JOA. In fact, in a letter dated June 9, 2006, he admitted to Wade and Scherbach that he did not have the money to fund the 45% that would have been his share of the operations.[4] Finally, as explained above, the gross negligence and willful misconduct standards are not applicable here, and we need not address Reeder's argument regarding them. The jury's finding that Reeder breached his duty as operator by failing to maintain production in paying quantities in the Forest Hill Field is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. We overrule Reeder's issues two through five.

### Obligation to Offer Well No. 116 to Other Working Interests Before Abandonment

■ In issues seven through ten, Reeder contends the evidence is legally and factually insufficient to support the jury's answer to Question No. 18 that he breached a duty to Dekrfour, Nelson, and Wood County Oil by failing to offer Well No. 116 to them prior to plugging the well.

---

4. Nothing in this opinion should be construed as requiring an operator to conduct an operation when the nonoperating leasehold working interest owners elect not to participate in, i.e., pay for, that operation.

Reeder argues that he did not elect to abandon or plug the well, but was ordered by the Railroad Commission to plug the well. He also asserts that he owed no duty to Wood County Oil because Wood County Oil did not have an interest in Well No. 116 at the time the Railroad Commission ordered it to be plugged. He also argues that, at the time the well was plugged, Wood County Oil had ownership rights in the well and there is no evidence that Reeder had any authority to offer the well back. Finally, he asserts the evidence is legally and factually insufficient to support a finding that his actions amounted to gross negligence or willful misconduct.

In 1998, Reeder became the operator of Well No. 116. From this time forward, there was controversy between Fry and Reeder as to how Well No. 116 should be produced. In 2003, the well began to leak. By its order dated October 21, 2003, the Railroad Commission ordered Reeder as the operator to plug the well. Reeder finally plugged the well on June 9 and 10, 2004.

Reeder did not contest that he was the operator of Well No. 116. Again, this authority devolved upon him by the JOA, which stated in pertinent part:

> If Operator deems that a well should be abandoned, it shall notify the non-Operators of such decision and offer his interest in such well to any party willing to accept the well, together with the plugging liability. If no party requests such well, the Operator shall cause the well to be properly plugged and the lease restored and the costs there for shall be a joint expense under this Agreement.

 When a well is plugged in Texas, it is considered abandoned. *See* 16 TEX. ADMIN. CODE § 3.5(d)(2)(C) (2009) (Tex. R.R. Comm'n); *see also Ridge Oil Co. v. Guinn Invs. Inc.*, 148 S.W.3d 143, 147 (Tex.2004). Therefore, by the terms of the JOA, Reeder was required to offer his interest in Well No. 116 to the nonoperators before plugging the well. The evidence shows that on June 9, 2004, Dekrfour and Nelson, collectively, had a 12.5% carried working interest in the Harris Sand Unit and that Wood County Oil had an 87.5% working interest in the Harris Sand Unit. They were nonoperators in Well No. 116. By the terms of the JOA, Reeder had the duty and authority to offer Well No. 116 to the Fry Interests, Wood County Oil, or both before plugging it, but he did not do so. The evidence is legally sufficient to support the jury's answer to Question No. 18. *See Cazarez*, 937 S.W.2d at 450.

Reeder contends the above provision of the JOA does not apply here because he did not "deem" that the well should be abandoned, but instead was ordered to plug the well. We disagree. The Railroad Commission initially recommended that he plug the well. At that point, he had the option of repairing the well. When he chose not to repair the well, he chose to abandon the well. His argument that he did not need to offer the well to Wood County Oil because it did not own an interest at the time of the Railroad Commission's order also fails. The JOA does not limit the offer requirement to a certain time period. The wording indicates that the offer of the well can be made at any time before the well is plugged. The assignment to Wood County Oil was signed on May 24, 2004 but was effective November 24, 2003, one month after the Railroad Commission's order to plug the well and several months before Reeder actually plugged the well. As operator, Reeder had the authority and the duty under the JOA to offer the well to nonoperators, including Wood County Oil. Finally, as explained above, we need not address Reed-

er's argument that the evidence is legally and factually insufficient to support a finding that his actions amounted to gross negligence or willful misconduct. The evidence is factually sufficient to support the jury's answer to Question No. 18. *See Dow Chem., Co.*, 46 S.W.3d at 242. We overrule Reeder's issues seven through ten.

### Damages

In his eleventh issue, Reeder complains that Bob Ungerecht's testimony of valuation was conclusory and speculative and therefore no evidence. In his thirteenth issue, he attacks the jury's allocation of damages between the Fry Interests and Wood County Oil as being irreconcilably ambiguous. In his fourteenth issue, Reeder contends that the evidence is not legally and factually sufficient to support the jury's verdict on damages.

■■■■■ Before a plaintiff can recover damages, he must prove "with reasonable certainty" the damages he suffered from the defendant's breach, including the value of "a certain quantity of oil, worth a certain amount. . . ." *See Tex. Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 427, 6 S.W.2d 1031, 1033 (1928). The value of mineral reserves is not a matter of common knowledge, and therefore it is the plaintiff's burden to prove damages by expert testimony. *Arkoma Basin Exploration Co. v. FMF Assoc. 1990–A, Ltd.*, 249 S.W.3d 380, 388 (Tex.2008). Experienced people who are acquainted with the conditions of the land in the locality of the leased premises can give an opinion as to the amount of recoverable oil in the unit. *See Barker*, 117 Tex. at 427, 6 S.W.2d at 1034. The plaintiff's expert should, after examining the logs and other relevant information from the field and surrounding wells, give an opinion as to the probability of obtaining production and the extent of such production on the land in question. *See*

*County Mgt., Inc. v. Butler*, 650 S.W.2d 888, 890 (Tex.App.-Austin 1983, writ dism'd). Such matters as production costs, geological trends, proration, and kind and quality of the oil should also be referred to by the expert in making his opinion. *Id.*

■■■■■ The nature of the inquiry makes it practically impossible to ascertain with certainty the exact amount of the plaintiff's damage. *Barker*, 117 Tex. at 427, 6 S.W.2d at 1034. But damages must be established with reasonable certainty, not mathematical precision. *O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 422 (Tex.App.-Houston [14th Dist.] 2009, pet. filed). If the best available evidence affords a reasonable basis for the jury to calculate damages, then recovery cannot be denied because the exact amount of damages cannot be ascertained. *Id.* As a general rule, the jury has broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for its calculation. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 760 (Tex.App.-Dallas 2008, no pet.). The jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear. *Id.*

■■■■■ Ungerecht, who had been a petroleum engineer for fifty-two years at the time of trial, testified that he used industry standards in preparing his testimony. He explained that he is familiar with the Harris Sand Field and had the information necessary to do a complete and thorough evaluation of the field. He testified that, because of all the drilling and the production from both the Sub–Clarksville Unit and the Harris Sand Unit, there was an abundance of information available including logs, coring samples, maps, geological formation information, production history, well tests, planimeter results, and other

documents to show him the amount of recoverable reserves for each of the twelve tracts he testified about. *See Butler,* 650 S.W.2d at 890. He further testified that he was able to study the production costs for operations such as drilling, installing the surface equipment, and installing tanks. He also was able to determine the operating costs based on the documentation that he had studied. He discounted his evaluation for the decline rate, market value, taxes, royalties, and the carried working interests. He stated that he considered the uncertainty and risk involved in beginning production again from the unit formations. He testified about the gravity of the oil in the Harris Sand Unit compared to the lighter oil in the Sub–Clarksville Unit and how that would affect the value of the recoverable oil. *See id.*

Reeder characterizes Ungerecht's testimony as being speculative and conclusory. First, he states that Ungerecht based his valuation on records showing the amount of oil in place in the two units in 1996. He argues that the valuation is thus founded on speculation that the basic reservoir information remained unchanged for nearly twelve years. Ungerecht specifically testified that while the value of the reserves has changed over the years, the change was caused primarily by the price of oil. Therefore, while his earlier evaluations were the basis of his calculations, he upgraded the information as to price. The jury was entitled to infer that Ungerecht, based on his years of experience, considered whether the reservoir information had changed and determined that it had not. *See City of Keller,* 168 S.W.3d at 821. Further, the jury saw the production records from the intervening years showing very little depletion in the field. We disagree that Ungerecht's reliance on the 1996 information makes the testimony speculative.

Reeder challenges Ungerecht's testimony because, while there was no production at the time he testified, Ungerecht based the value of the reserves on the price of oil at the time of trial, instead of the price at the time production ceased. Ungerecht explained that he had to extrapolate production based on the recoverable oil because there were no current figures. This was a logical explanation and one that would help the jury in determining valuation.

Reeder complains that Ungerecht valued the Harris Sand Unit reserves as though the formation was in its primary recovery period when it was in a secondary recovery period. Ungerecht, on direct, testified that he based his valuations on primary production. However, during Reeder's cross examination, Ungerecht was asked hypothetical questions regarding secondary production on the Harris Sand Unit. Although Ungerecht answered these hypothetical questions, neither his testimony nor any other evidence suggests that his valuation should not be based on primary recovery. Ungerecht's testimony is not speculative or conclusory. Thus, the evidence is legally sufficient to support the damage awards.

■ Reeder also attacks the jury's allocation of damages between the Fry Interests and Wood County Oil. Generally, the jury awarded about one-tenth of Ungerecht's valuation to the Fry Interests for their losses in the Harris Sand formation due to Reeder's actions as operator. This amount was three times the amount awarded to Wood County Oil. Reeder contends that this makes the jury's answers irreconcilable. We disagree. Ungerecht testified that the extraction costs were very high for the oil produced out of the Harris Sand formation. This testimony was corroborated by both David Fry and Noble. The jury could therefore have ra-

tionally concluded that the carried working interests owned by Dekrfour and Nelson were three times as valuable as the working interest of Wood County Oil because of these heavy costs of production. *See Christian,* 257 S.W.3d at 760.

■ Reeder challenges the jury's award of damages to the Fry Interests for their losses in the Sub–Clarksville formation while awarding Wood County Oil zero damages for that formation. The plausible basis for this award is that the jury found the production in paying quantities in the Sub–Clarksville Unit had ceased in 2003. Wood County Oil did not acquire its working interest until 2004. As a result, the jury could rationally have determined that Wood County did not have an interest in the Sub–Clarksville Unit when production in paying quantities ceased. *See id.*

■ Based on his experience and the documentation, Ungerecht assigned specific valuations to each of the twelve tracts in the Sub–Clarksville and Harris Sand Units that he was asked to value. *See Barker,* 117 Tex. at 427, 6 S.W.2d at 1033. The jury's awards to the Fry Interests and Wood County Oil were much smaller than Ungerecht's valuations. A jury's verdict on damages cannot exceed the amount shown by the evidence, but a jury need not award the full amount testified to by the expert when the situation warrants a reduction. *See Geo Viking, Inc. v. Tex–Lee Operating Co.,* 817 S.W.2d 357, 363 (Tex.App.-Texarkana 1991, writ denied). Here, the nature of the asset being valued lends itself to imprecise valuations. The reports showed a wide range of production levels for the field over the years. Ungerecht testified that many variables are not constant, including the price of oil and the costs of production and maintenance. Further, he testified that he considered "certain unknowns" such as an estimate of the availability of each oil well

to produce at a certain rate and an estimate of the life of that well to produce. Additionally, Ungerecht testified that he was unable to determine productive capacity because the field was not in full production. Accordingly, the imprecision in the factors Ungerecht relied on for determining valuation of the field warranted the jury's belief that the awards should be reduced. Thus, the evidence is also factually sufficient to support the damage awards. *See Dow Chem. Co.,* 46 S.W.3d at 242. We overrule Reeder's issues eleven, thirteen, and fourteen.

### WOOD COUNTY OIL'S PLEADINGS

■ In his twelfth issue, Reeder contends that Wood County Oil's claim for damages is not supported by its pleadings. About a month before trial, Wood County switched sides in the case. Wood County had been aligned with Reeder against the Fry Interests but filed a cross-claim against Reeder alleging that he had caused loss of the unit leases by his actions as unit operator. About a week before trial, Wood County filed its first amended petition continuing its declaratory action on title issues but specifically nonsuiting all of its claims against the Fry Interests. The previously pleaded claim against Reeder is not mentioned in the amended petition.

■ Assuming Wood County inadvertently nonsuited Reeder in the live pleading by omitting any mention of its claim against Reeder, it is clear from a review of the record that the breach of contract issues between Wood County Oil and Reeder were tried by consent. Both sides presented evidence against each other on these issues and asserted differing positions on these issues at the charge conference. When both parties present evidence on an issue and the issue is developed during trial without objection, any defects in the pleadings are cured at trial, and the

defects are waived. *See* Tex.R. Civ. P. 67; *Ingram v. Deere,* 288 S.W.3d 886, 893 (Tex.2009). We hold that any defects in Wood County's amended pleading were cured when the breach of contract issues were tried by the consent of the parties. We overrule Reeder's twelfth issue.

### Conformity of Final Judgment to Jury's Awards

In his fifteenth issue, Reeder complains that the trial court's final judgment does not conform to the actual awards the jury made to the Fry Interests. We agree. The jury made the following specific monetary awards:

| | |
|---|---|
| Dekrfour and Nelson | $299,102.50 |
| Dekrfour, Nelson and Bobby Noble | $390,887.00 |
| Dekrfour | $ 9,202.00 |
| Nelson | $ 36,808.00 |

However, the trial court's judgment awarded damages as follows:

| | |
|---|---|
| Dekrfour | $138,719.10 |
| Nelson | $561,237.00 |
| Noble | $ 36,043.40 |

█ The trial court's duty, and ours, is to ascertain the intention of the jury's answers and render a judgment in conformity with them. *See* Tex.R. Civ. P. 301; *In re Estate of Bean,* 206 S.W.3d 749, 760 (Tex.App.-Texarkana 2006, pet. denied). There is a clear discrepancy between the jury's awards and the judgment. We sustain Reeder's fifteenth issue.

### Attorney's Fees

█ In his sixteenth issue, Reeder contends that the trial court's award of attorney's fees was not authorized and was not supported by legally and factually sufficient evidence. Based on the jury's answers to Question No. 20, the trial court awarded Marcus Carroll, the attorney for the Fry Interests, $125,000.00 in attorney's fees with prejudgment interest at the rate

of 6%. Carroll testified that his reasonable and necessary attorney's fees for each of the four claims asserted against Reeder totaled $115,250.00 as shown in the table below.[5] The table also shows the amount of attorney's fees the jury awarded for each of the four claims, which totaled $125,000.00.

| Cause of Action | Carroll's Testimony | Jury's Award |
|---|---|---|
| Failure to file P-4 under JOA | $ 7,500.00 | $ 7,500.00 |
| Breach of JOA on failure to offer Well No. 116 before abandoning | $ 12,500.00 | $ 35,000.00 |
| Declaratory judgment action to determine title | $ 55,250.00 | $ 55,000.00 |
| Breach of JOA for loss of leases | $ 40,000.00 | $ 27,500.00 |
| | $115,250.00 | $125,000.00 |

Reeder contends that attorney's fees were not recoverable on the breach of the JOA claims, that is, the failure to offer Well No. 116 to Dekrfour and Nelson before plugging it and the loss of the leases. He argues that the fees awarded were not segregated by claim and contends further that because the fees were based in part on claims for which such fees are not recoverable, the award cannot stand.

The Texas Civil Practice and Remedies Code provides that parties may recover reasonable attorney's fees if the claim is for an oral or written contract. Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (Vernon 2008). As we have shown in issue one, the JOA was a written contract, and Reeder was bound by it. The claim asserted by Dekrfour and Nelson (for the failure to offer the well), and the claim asserted by the Fry Interests (for the loss of the leases), arose under the JOA. Further, attorney's fees are recoverable pursuant to the

---

5. Reeder has not challenged, and therefore we do not address, the jury's award to Patricia Fry for Reeder's failure to file a P-4 with the Texas Railroad Commission or the court's declaratory judgment to determine title.

Declaratory Judgment Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 2008). Therefore, the Fry Interests can recover their reasonable and necessary attorney's fees for these claims, and the failure to segregate is not error.

 Reeder also contends that there is insufficient evidence to support the award of $125,000.00 in attorney's fees. We agree with this contention. As the table above shows, Carroll testified that $12,500.00 was a reasonable attorney's fee for his work on Dekrfour's and Nelson's claim that Reeder breached the JOA by failing to offer Well No. 116 to them before plugging it. Despite this testimony, the jury awarded $35,000.00 in attorney's fees for that claim. The evidence is not factually sufficient to support this portion of the jury's attorney's fee award. It is an abuse of discretion for the trial court to award fees without factually sufficient supporting evidence. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998).

 Carroll testified that his attorney's fees totaled $115,250.00. The jury determined that $27,500.00 was a reasonable fee for Carroll's work on the breach of the JOA by the loss of the leases, $12,500.00 less than Carroll testified to. The jury also awarded $250.00 less than Carroll testified to earning on the declaratory judgment action. The jury was entitled to award a lesser amount if it so chose. *See Geo Viking, Inc.,* 817 S.W.2d at 363. Therefore, based on Carroll's testimony and the jury's award, the trial court should have awarded Carroll $102,500.00 in reasonable attorney's fees. The evidence is legally and factually sufficient to support an award in this amount. We sustain Reeder's sixteenth issue in part and overrule it in part.

### PREJUDGMENT INTEREST

In his seventeenth issue, Reeder contends that the trial court miscalculated the prejudgment interest on awards to Dekrfour, Nelson, Noble, and Wood County Oil. He argues that the trial court erroneously used March 14, 2006, the date the Fry Interests filed their counterclaim, as the starting date for calculating all prejudgment interest. He asserts that prejudgment interest on damages awarded to the Fry Interests under Questions 9 and 10 should be calculated from the date of their amended counterclaim, July 20, 2007, which is the date the claim addressed in those questions was first pleaded. He further asserts that prejudgment interest for Wood County Oil should be calculated from January 10, 2008, when it filed its original cross-claim against Reeder. We agree that prejudgment interest on the damage awards was miscalculated. *See* TEX. FIN.CODE ANN. § 304.104 (Vernon 2006). Further, the prejudgment interest awards are based on the erroneous damage awards and must be recalculated due to our disposition of issue fifteen.

 Reeder also contends the trial court erred by awarding prejudgment interest on the award of attorney's fees. Prejudgment interest is generally not allowed on an award of attorney's fees. *See C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 325 (Tex.1994). We sustain Reeder's seventeenth issue.

### CONCLUSION

Reeder, as operator, is bound by the 1996 joint operating agreement, and the claims asserted against him here are for breach of contract. When measured against the elements of breach of contract, the evidence is legally and factually sufficient to support the jury's findings that Reeder breached his duty as operator by failing to maintain production in paying

quantities or other operations in the Forest Hill Field and by failing to offer Well No. 116 to the nonoperators before plugging the well. The evidence is also legally and factually sufficient to support the jury's damage awards. However, the trial court's judgment does not conform to the jury's damage awards. Because we have the necessary information before us, we may reform the judgment. *See* Tex.R.App. P. 43.2(b); *Mullins v. Mullins*, 202 S.W.3d 869, 878 (Tex.App.-Dallas 2006, pet. denied). Accordingly, we modify the judgment to order the specific damage awards as found by the jury. Because the prejudgment interest on the damage awards was miscalculated, we modify the judgment to reflect the proper amounts of prejudgment interest. Because it is not appropriate in this case, we delete the award of prejudgment interest on attorney's fees.

We affirm the trial court's judgment with respect to attorney's fees in the amount of $102,500.00, conditioned on a remittitur of attorney's fees in the amount of $22,500.00. *See* Tex.R.App. P. 46.3; *Stukes v. Bachmeyer*, 249 S.W.3d 461, 470 (Tex.App.-Eastland 2007, no pet.). If this remittitur is not filed within fifteen days from the date of this opinion, the trial court's judgment as to attorney's fees will be reversed and the cause will be remanded to the district court for a new trial. *See* Tex.R.App. P. 46.3.

We *affirm* the trial court's judgment, as *modified.*