COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| NOVA MUD, INC., | § | |
| Appellant, | § | No. 08-17-00147-CV |
| v. | § | Appeal from the |
| SANDRA H. STALEY, Individually, As Independent Executrix of THE ESTATE | § | 109th District Court |
| OF GEORGE G. STALEY, Deceased, and as Trustee of the TAX FREE TRUST FOR | § | of Winkler County, Texas |
| SANDRA H. STALEY, | § | (TC# 15,683-B) |
| Appellee. | § | |

## O P I N I O N

Nova Mud appeals the trial court's judgment denying foreclosure on a purported materialman's lien burdening an oil well (the A.G. Hill No. 1 Well) in which Sandra H. Staley, independently and as the executrix of her husband George Staley's estate, held an interest. The trial court held that the lien perfected against the well and the underlying leasehold to secure unpaid bills related to drilling operations at the wellsite had been extinguished because Nova Mud and the well's co-tenant, Heritage Standard Corporation (Heritage), settled claims for the unpaid bills in bankruptcy court.

In seven issues, Nova Mud contends that the trial court erred by failing to order foreclosure on the lien against the well, as the bankruptcy settlement extinguished the lien only as to Heritage's

well interest, not Staley's. We disagree. The trial court's refusal to order foreclosure was not erroneous. We will affirm.

## BACKGROUND

*Factual History*

This appeal arises from a single trial in which a cluster of materialmen-plaintiffs alleged they performed work on a drilling project at the A.G. Hill No. 1 Well for which they were not paid.[1] Because the ownership of various well interests is partly at issue in this appeal, we will briefly recite the history of transfers.

Geologist George Staley, believing that A.G. Hill No. 1 Well located on a leasehold known as Section 6 would be a good prospect for oil and gas production if the well line could avoid a problematic area, approached the well's working interest holder,[2] Heritage, about executing a possible farmout agreement[3] before the leases governing the well expired for lack of drilling/production. Heritage, which owned 100 percent of the working interest, and believing

---

[1] This Court is concurrently considering a separate set of consolidated appeals brought by other subcontractors from the same trial and judgment. *See Acme Energy Servs., Inc. d/b/a Big Dog Drilling v. Staley*, No. 08-17-00145-CV; *Endeavor Energy Res., L.P. v. Staley*, No. 08-17-00146-CV; and *Acme Energy Servs., Inc. d/b/a Rig Movers Express v. Staley*, No. 08-17-00148-CV. While these companion cases have been docketed separately on appeal and differ in terms of the identities of specific subcontractors and the amount of money owed, the subcontractors all participated jointly in all proceedings including the trial from which this appeal was taken, and the legal arguments raised by all debtors are essentially indistinguishable. All ultimately turn on the question of whether a settlement they agreed to in bankruptcy court released the lien at issue in this case.

[2] "A working interest is an operating interest under an oil and gas lease that provides its owner with the exclusive right to drill, produce, and exploit the minerals." *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 599 n. 3 (Tex.App.—Austin 2000, pet. denied).

[3] "A farmout is a common form of agreement between operators, in which a lease owner that does not want to drill assigns the lease, or some portion of it, to another operator that does." *Young Ref. Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 389 (Tex.App.—Houston [1st Dist.] 2001, pet. denied). "The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the acreage as a prerequisite to completion of the transfer." [Citation and emphasis omitted]. *Id.* "In essence, an oil company will reward another operator who fulfills its lease obligations with a sublease or rights assignment, often as a way to fulfill its contractual with the landowner while sharing financial risks of drilling operations and increasing its ability to profit off of petroleum products it may not be equipped to market by including a third party in the deal." *Clayton Williams Energy, Inc. v. BMT O & G TX, L.P.*, 473 S.W.3d 341, 346 n.2 (Tex.App.—El Paso 2015, pet. denied).

expiration of the leases to be imminent, executed a farmout which assigned Staley a percentage of carried working interest[4] in the leases once the well project was completed and productive. Per the farmout agreement, Staley's interest was contingent, and Heritage would retain its 100 percent interest pending completion.

After Staley signed the farmout, Lakehills Production, Inc., was hired to oversee drilling operations. Lakehills, in turn, hired multiple subcontractors including Nova Mud to perform work on the project. Nova Mud performed work at the drill site on June 24, 2008 and July 17, 2008, and sent invoices totaling $262,448.41 to Lakehills. The invoices were never paid. Nova Mud perfected a lien against the property on December 29, 2008. The Mineral Property Lien Affidavit recorded in Winkler County identified Heritage Standard Corporation as the owner and operator of the Section 6 Leases and of the A.G. Hill No. 1 Well; stated that Nova Mud signed a contract with Lakehills Production, who was acting as contractor operator/agent for Heritage Standard Corporation, for certain services at the wellsite; and alleged a claim worth $262,448.41 against the leasehold interests owned by Heritage for non-payment.[5]

---

[4] A carried working interest in an oil and gas lease is an executive "fractional interest that is free of some or all costs of exploring, drilling, and completing the well." *Reeder v. Wood County Energy, L.L.C.*, 320 S.W.3d 433, 445 (Tex.App.—Tyler 2010), *rev'd,* 395 S.W.3d 789 (Tex. 2012).

[5] The lien affidavit reads, in relevant part:

> Claimant having furnished and hauled materials, machinery or supplies for and in connection with the operating, completing, maintaining, equipping, or repairing of one or more oil and/or gas wells situated on the oil, gas, and mineral leasehold estate(s) hereinafter described, makes this Affidavit pursuant to § 56.001 *et seq* of the TEXAS PROPERTY CODE for the purpose of perfecting a lien upon the oil, gas, and mineral leasehold(s) described, including all property thereon as provided in § 56.003 of the TEXAS PROPERTY CODE to secure the amount of Claimant's claim.
>
> Heritage Standard Corporation . . . and/or Heritage Consolidated, LLC . . . [business addresses omitted] is the owner or reputed owner of an interest in the following oil and gas lease(s) and/or oil, gas, and mineral leases(s)[sic]:
>
> .     .     .
>
> [LEGAL DESCRIPTIONS OF LEASES INCLUDING SUBJECT PROPERTY]
>
> Under a contract with Lakehills Production, Inc., which was acting as a contract operator

3

Meanwhile, a dispute arose among Heritage, Staley, and well investors. On June 2, 2009, after the well was completed, the well's investors entered into a settlement agreement that finally allocated the working interest percentages in the subject property. As a result of this settlement, Staley received a 17.75 percent working interest. By the time of trial in this case, Staley would ultimately end up with 19.75 percent of the working interest as the result of subsequent assignments. The settlement agreement among the well's interest-holders provided that Trius Energy would be responsible for paying the unpaid subcontractors. It is undisputed on this record that Trius did not pay those bills.

*Procedural History*

In July 2009, Nova Mud and others filed suit against Heritage, Staley, and others seeking foreclosure of its lien against the well. According to the original petition, Staley was included in the lawsuit because Staley was Heritage's successor-in-interest, as he took his interest in the well while that interest was still subject to Nova Mud's lien.

On September 14, 2010, Heritage—the well's majority working interest holder—filed for bankruptcy. The state court severed Nova Mud's claims against Heritage and allowed suit to

---

or agent for Heritage Standard Corporation, Claimant did furnish materials, machinery, or supplies and/or perform labor and services on or about June 24, 2008, and July 17, 2008 for and in connection with the operating, completing, maintaining or repairing of one or more oil and/or gas wells owned or reputedly owned and/or operated by Heritage Standard Corporation, said well(s) being known as the AG Hill #1 Well located in Section 6, Block 74, PSL Survey, Winkler County, Texas . . . .

Claimant timely served written notice that the lien is claimed on Heritage Standard Corporation and Heritage Consolidated, LLC.

The true and correct amount claimed by Claimant is Two Hundred Sixty-two Thousand Four Hundred Forty-eight and 41/100 Dollars ($262,448.41), and said amount is just and reasonable, due and unpaid, and all just and lawful payments, offsets, and credits have been allowed. . . . This lien claim for the amount stated above is upon the oil, gas, and mineral leasehold(s), any well or wells locate[d] thereon, with all personal property, equipment, buildings, appurtenances, pipelines, right-of-ways, etc. located thereon and used or obtained in connection therewith and other items of property . . . .

Executed the 9th day of December, 2008.

4

continue against the remaining defendants in state court. However, when Nova Mud filed a proof of claim in bankruptcy court[6] against Heritage, the state trial court stayed all proceedings in the foreclosure case pending resolution of Nova Mud's claims in the bankruptcy court. It is undisputed that Nova Mud's proof of claim in the bankruptcy proceeding for $262,448.41 plus prepetition interest and attorney's fees was based off its unpaid invoices worth $262,448.41 from the well project.

On August 18, 2015, after prolonged bankruptcy litigation,[7] Nova Mud and Heritage entered into a series of stipulations settling claims before the bankruptcy court, which the bankruptcy court approved on October 1, 2015. In Paragraph 4, Section A of the stipulations, Heritage acknowledged that it owed Nova Mud $292,073.71 (the Stipulated Amount), which represented the invoiced amount ($262,448.41) plus 50 percent of the prepetition interest and attorney's fees that Nova Mud sought. Section B of the same paragraph specified that a portion of the Stipulated Amount ($58,648.41) "shall be an Allowed Section 6 M &M Secured Claim in

---

[6] Filling a proof of claim allows a creditor to pursue payment of a claim from the debtor's bankruptcy estate. With respect to secured creditors such as Nova Mud, the United States Bankruptcy Court for the Northern District of Texas explained:

> The Bankruptcy Code does not require a secured creditor—i.e., a creditor with a lien—to file a proof of claim. The law is well established that ordinarily, liens pass through bankruptcy unaffected, and a secured creditor can ignore the bankruptcy case and look solely to his collateral in satisfaction of the debt (although he will be stayed from doing so during the pendency of the case).

> However, should the creditor elect to seek payment of the debt as a personal obligation of the debtor, the creditor must file a proof of claim in order to be entitled to a payment of the obligation as a personal liability of the debtor (instead of from the collateral) and, once bankruptcy intervenes, payment from the bankruptcy estate. [Internal citations omitted].

*In re Kleibrink*, 346 B.R. 734 (Bankr. N.D. Tex. 2006), *aff'd*, No. 3:07-CV-0088-K, 2007 WL 2438359 (N.D. Tex. Aug. 28, 2007), *aff'd*, 621 F.3d 370 (5th Cir. 2010).

[7] Nova Mud and other subcontractors filed proofs of claim and an adversary proceeding against Heritage in the bankruptcy court. The bankruptcy judge granted Heritage's motion for summary judgment, and the district court affirmed. However, the Fifth Circuit reversed and remanded to the bankruptcy court, finding that a fact question as to whether Heritage in fact owed the debt to the subcontractors. *See In re Heritage Consol., L.L.C.*, 765 F.3d 507, 515–16 (5th Cir. 2014).

Class 3A . . . for properly and timely perfected mineral contractor liens . . . ”[8]  Section D stated that to the extent "the value of the Section 6 Assets is greater than the total amount of all Allowed Class 3A Secured Claims," interest would accrue on Nova Mud's Allowed Class 3A Secured Claim until such claim is satisfied in full, but Section E stated that if the value of the Section 6 Assets was less than the total amount of all Allowed Class 3A Secured Claims, Nova Mud would not be entitled to post-petition interest, attorney's fees, and expenses, but it could pursue prepetition deficiencies as an Allowed Class 5 General Unsecured Claim.  The remaining $233,425.36 would be treated as an Allowed Class 5 General Unsecured Claim.

Paragraph 5 of the settlement agreement dealing with releases reads:

> Upon approval of this Stipulation, the parties agree that, other than the continued indebtedness of the Stipulated Amount under the terms of this Stipulation, Heritage and the Trustee on the one hand, and Nova Mud on the other, release each other and their respective counsel, agents, subsidiaries, and affiliates from all claims, causes of action, rights, demands, actions, costs, judgments, expenses, damages and liabilities whatsoever, at law or in equity, whether known or unknown, that arise out of or relate to the facts and circumstances made the basis of the Nova Mud Proofs of Claim, or that were or could have been asserted in the Nova Mud Proofs of Claim and the Trustee's objection thereto.  In that regard, Nova Mud acknowledges and agrees that its recovery hereunder shall be in full and final satisfaction of its putative claims and liens against any interests of Heritage and/or the Trust in Section 6 Assets, and they shall not assert or enforce any claims and liens against any such interests, including, without limitation, any interest currently attributed to Trius in Section 6 Assets and/or recovered by the Trust through enforcement of claims against Trius in Section 6 Assets.  This release is not intended to release any claims or liens owned or held by Nova Mud against George Staley, J.R. Operating Company, Dennis Rosini and their successors and assigns.

On November 10, 2015, George Staley died.  His executrix filed an original answer on June 1, 2016, denying all claims.

Following the bankruptcy settlement, the bankruptcy stay was lifted, and state court

---

[8] A footnote indicates that the phrase "Allowed Section 6 M & M Secured Claim" is a phrase defined in the Confirmed Second Amended Joint Plan or Reorganization for the Debtors, but the Plan containing the definition of that specific phrase does not appear in the record.

proceedings resumed. A bench trial in Winkler County on Nova Mud's foreclosure action commenced on March 28, 2017. By the time of trial, Nova Mud had non-suited all defendants except Staley. The trial lasted less than a day and was decided largely based on a series of agreed stipulations filed by both sides and the bankruptcy settlement Nova Mud signed with Heritage. Per the agreed stipulations, Nova Mud had received $26,561.41 in payment from Heritage as of the date of trial.

The trial court found in favor of Staley. In its findings of fact, the trial court recognized the stipulations and stated that there was no debt owed to the plaintiffs on the invoices. In its conclusions of law, the trial court stated that no debt was owed on the invoices, the lien claimed by Nova Mud had been extinguished, and that because the lien was extinguished, Nova Mud could not prevail on the claims it asserted against Staley. This appeal followed.

## DISCUSSION

Nova Mud raises seven issues on appeal. In Issues One and Two, Nova Mud argues that the trial court's denial of its request for foreclosure was unsupported by legally or factually sufficient evidence. Nova Mud then weaves its next three issues together, arguing that the trial court erred by finding the debt did not exist (Issue Three) because the trial court erroneously concluded that the bankruptcy settlement with Heritage released the lien against the well (Issue Four) and thus wrongfully determined that Nova Mud could not foreclose on the well (Issue Five). Because the trial court failed to order foreclosure, the trial court also necessarily erred by denying Nova Mud any equitable and just attorney's fees (Issues Six and Seven).

All the issues in Nova Mud's appeal hinge on the ultimate premise that the trial court misconstrued the bankruptcy settlement as satisfying the entire debt dispute and releasing the materialman's lien as to all well interest holders. Nova Mud asserts that even though it settled its

7

bills related to the well project with Heritage, it may still foreclose on the lien.

We disagree. The bankruptcy settlement, while not a model of drafting clarity, appears to have settled all debt issues related to the bills from the well project. Once Nova Mud agreed to the terms of the settlement in the bankruptcy court, the lien against the well securing that debt dissolved as a matter of law. The trial court correctly determined that there was no longer an enforceable lien on the well, including on the interest in the well held by Staley's estate.

### *Standard of Review and Applicable Law*

We note that while Nova Mud frames this dispute in terms of legal and factual sufficiency, the historical facts underlying this dispute have been stipulated by both parties and are essentially undisputed. We do not review the legal or factual sufficiency of stipulated facts, but instead review the correctness of the application of the law to the admitted facts *de novo*. *City of Harlingen v. Avila*, 942 S.W.2d 49, 51 (Tex.App.—Corpus Christi 1997, writ denied). Furthermore, the heart of this matter is not a dispute about what events actually happened, but rather the interpretation of the scope of the agreed bankruptcy judgment giving legal force to the settlement agreement. We review unambiguous legal texts *de novo*.

A materialman's lien, also known as a mechanic's lien, secures payment for a laborer's work when, among other things, a laborer makes improvements to real property. *See Crawford Servs., Inc. v. Skillman Int'l Firm, L.L.C.*, 444 S.W.3d 265, 268 (Tex.App.—Dallas 2014, pet. dism'd)(discussing history of mechanic's liens). When a property is burdened by a materialman's lien, the laborer who holds the lien has two ways to obtain payment for his or her services. While the laborer may sue the other party *in personam* for breach of contract, the laborer may also instead foreclose on the collateral directly in a judicial proceeding and force the sale of the collateral at auction to satisfy the debt. This is true regardless of whether the current holder of the collateral

8

was personally liable on the contract for payment. *Crawford Servs., Inc.*, 444 S.W.3d at 268.

Materialmen's liens are guaranteed by the Texas Constitution and are governed by constitutional provisions and various specific statutes. *Id.*; *see also* TEX.CONST. art. XVI, § 37 ("Mechanics, artisans and material men, of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon . . . "). Chapter 56 of the Texas Property Code sets out the requirements for perfecting a materialman's lien against mineral interests. *See* TEX.PROP.CODE ANN. § 56.002 (allowing a mineral contractor or subcontractor to have a lien to secure payment for labor or services related to mineral activities). The lien attaches to, *inter alia*, the land, leasehold, oil or gas well, and other property and machinery, though a lien created by performing labor for a leaseholder does not attach to the fee title to the property. TEX.PROP.CODE ANN. § 56.003(a)-(b). A person claiming the lien must file an affidavit with the county clerk of the county in which the property is located not later than six months after the debt accrues. TEX.PROP.CODE ANN. § 56.021(a). However, before being able to perfect the lien, a mineral subcontractor claiming the lien must serve the property owner with written notice that the lien is being claimed not later than the 10th day before the affidavit is filed. TEX.PROP.CODE ANN. § 56.021(b). The lien affidavit and written notice are subject to various formal requirements. *See* TEX.PROP.CODE ANN. §§ 56.022, 55.023.

Properly perfected mineral subcontractor materialmen's liens are enforced under Chapter 53 using the same procedures employed to enforce other types of materialmen's liens. TEX.PROP.CODE ANN. § 56.041(a). To enforce the lien, the lienholder must file a lawsuit, and to prevail, the lienholder must prove (1) it performed the labor or furnished the materials, (2) the debt is valid, and (3) it substantially complied with the statutory requirements for perfecting a lien. *Crawford Servs., Inc*, 444 S.W.3d at 267.

9

Staley does not dispute that Nova Mud performed labor at the wellsite, nor does she argue on appeal that Nova Mud failed to timely and substantially comply with the statutory requirements necessary to perfect the lien. Staley also does not contest the fact the well-interest held by the estate was burdened by Nova Mud's lien when the interest was received from Heritage. The only issue before this Court is whether the lien remained valid as to Staley's interest after Nova Mud settled the underlying bill debt dispute with Heritage in bankruptcy court.

*Analysis*

At the outset, we reiterate that while Staley is named as the defendant in this proceeding, a foreclosure action on a lien is aimed at a piece of property, not a person. Nova Mud readily admits that it has no claims against Staley personally, only against Staley's interest in the well subject to the purported lien. Furthermore, we agree with Nova Mud that there is no question the lien against the well was properly perfected and that Staley in the state court and Heritage in the bankruptcy court acknowledged the debt was valid. But as we have said, the critical, dispositive issue here is whether that lien survived the bankruptcy settlement. The ultimate resolution of Nova Mud's first five appellate issues all hinge on this question.

Ordinarily, liens survive bankruptcy proceedings unscathed, meaning that secured creditors can still enforce liens even after personal debt is discharged. *See Johnson v. Home State Bank*, 501 U.S. 78, 85 (1991)(bankruptcy eliminates *in personam* recovery but still allows for *in rem* recovery against collateral). Even so, litigants in bankruptcy court will often voluntarily release liens held against collateral in exchange for the right to payment directly from the reorganized assets of a person or corporation. *See In re Penrod*, 50 F.3d 459, 462–63 (7th Cir. 1995). In addition to voluntary release, a lien ceases to exist when the underlying debt is satisfied. In this case, the bankruptcy settlement between Nova Mud and Heritage indicates that the lien

10

would be released in favor for certain *in personam* recovery granted against Heritage by the bankruptcy court. Nova Mud interprets the lien release as applying only to Heritage's interest, arguing that a sentence at the end of the release section of the bankruptcy settlement agreement specifically allowed Nova Mud to proceed in foreclosure proceedings against Staley to satisfy the debt. Staley, on the other hand, argues that the bankruptcy settlement agreement shows that Nova Mud and Heritage (the original debtor) resolved all aspects of the debt dispute by signing a settlement that both superseded the terms of any preexisting debt arrangement and that released the unitary lien burdening both Heritage and Heritage's successors-in-interest.

We are inclined to agree with Staley. Although the lien listed the well as collateral, the lien also identified Heritage as the sole party that owed Nova Mud money. Additionally, while Staley later took an undivided fractional carried working interest in the same well from Heritage that was subject to the lien, the transfer of that interest to Staley did not fundamentally alter the nature of the lien. The well remained the collateral for a secured debt owed by Heritage as debtor to Nova Mud as creditor until the debt was satisfied or the lien was otherwise released. No one contends otherwise.

Nova Mud is correct when it says that after the transfer of title from Heritage to others, it would have been free to foreclose on the well either as to all working interest holders collectively or as against each individual successor-in-interest's fractional interest until the debt was finally satisfied. *See Efficient Energy Sys., Inc. v. J. Hoyt Kniveton, Inc.*, 631 S.W.2d 538, 540 (Tex.App.—El Paso 1982, no writ)(holding that a subsequent well-holder who took title subject to a mechanic's lien could still have its interest foreclosed upon even where the original debtor was slated to have its debts discharged in bankruptcy); *Bancroft v. Welch*, 258 S.W.2d 406, 408 (Tex.App.—Eastland 1953, no writ)(foreclosure of materialman's lien against 1/10th interest in

11

lease).

But Nova Mud did not choose to go that route. Instead, in bankruptcy proceedings, Nova Mud settled its claim for the debt with its debtor Heritage on mutually acceptable terms that were ratified by the bankruptcy court. These terms included *in personam* rights against Heritage and a sweeping release. Other than its claim for the Stipulated Amount, Heritage and Nova agreed to:

> [R]elease each other ***and their respective counsel, agents, subsidiaries, and affiliates*** from ***all claims, causes of action, rights, demands, actions, costs, judgments, expenses, damages[,] and liabilities whatsoever***, at law or in equity, whether known or unknown, ***that arise out of or relate to the facts and circumstances made the basis of the Nova Mud Proofs of Claim*** [i.e. the unpaid bill on the A.G. Hill No. 1 Well Project], or that were or could have been asserted in the Nova Mud Proofs of Claim . . . Nova Mud acknowledges and agrees that ***its recovery hereunder shall be in full and final satisfaction of its putative claims and liens against any interests of Heritage*** and/or the Trust in Section 6 Assets, and ***they shall not assert or enforce and claims and liens against any such interests*** . . . . [Emphasis added].

Nova Mud argues that the bankruptcy settlement's last sentence containing a purported reservation of rights to proceed with claims cabins these sweeping releases and allows for foreclosure against Staley's interest to continue. We disagree. Nova Mud admits it has no claims against Staley *in personam*; Staley is in this suit only because the estate holds property that is purportedly Nova Mud's collateral in its dispute with Heritage. True, Staley received his well interest subject to Nova Mud's lien. But Staley's interest is entirely derivative of Heritage's interest, and the lien that burdened Staley's interest in the well no longer burdens the well because the original parties identified in the lien affidavit (Nova Mud as creditor and Heritage as debtor) have settled their dispute. If Staley's interest in the well had transferred *prior* to the perfection of the mechanic's lien, and if the lien affidavit had been perfected as to *both* Heritage and Staley, then perhaps Nova Mud could argue severance and have reserved a right to proceed separately against Staley's interest after settling with Heritage in bankruptcy court.

12

But timing in this case is everything.  This case involves one lien securing one debt.  The one lien inhered in the well to secure payment for a dispute between Nova Mud and Heritage, which held 100 percent of the working interest at the time of perfection.  Staley took title to his undivided fractional carried working interest under the cloud of this dispute as Heritage's successor-in-interest, meaning that he held his interest in the well at the mercy of Nova Mud, which could foreclose on it at any time to satisfy its debt with Heritage.  When instead Nova Mud settled the underlying controversy with Heritage and agreed to release the lien in settling its *claim* against Heritage, Staley's interest was no longer subject to foreclosure because the *claim* underpinning the lien was settled and subject to a novation that included a release of the lien on Heritage's interest.  Regardless of whether the trial court viewed this as a novation substituting one debt for another (which would extinguish the lien), or as a voluntary release of the lien itself in exchange for certain preferences in its *in personam* recovery against Heritage in the bankruptcy court, it is clear that the lien no longer burdened the well as of the point of settlement.  Foreclosure against Staley would have been improper.

Nova Mud complains that Staley's reading of the bankruptcy settlement "is based on the palpably false premise that Heritage's indebtedness as reflected in the 2008 invoices . . . had been magically transformed by the Bankruptcy Stipulation into a 'different and new debt.'"  This process did not happen by magic.  This process happened by Nova Mud's own agreement to the terms of the settlement agreement resolving its controversy with Heritage in bankruptcy court.  If Nova Mud wished to foreclose on the lien, it could have elected to proceed directly in state court proceedings rather than file a proof of claim in the bankruptcy court, or it could have filed the proof of claim but then asked the bankruptcy court to lift the stay as to the state foreclosure proceedings to allow foreclosure on the lien and recoupment of any remaining losses against

13

Heritage *in personam*. Nova Mud elected to litigate in bankruptcy proceedings, and then settle and release the lien *and **all claims*** related to the debt. In doing so, it lost its right to foreclose on the lease as to Staley. The trial court did not err in declining to order foreclosure. We overrule Issues One, Two, Three, Four, and Five.

### *Attorney's Fees*

In Issues Six and Seven, Nova Mud maintains that the trial court erred by failing to award it attorney's fees. Because Nova Mud did not prevail on its substantive claim in the trial court, and because we determine that the trial court's decision was not in error, Nova Mud was not entitled to attorney's fees. Issues Six and Seven are overruled.

### CONCLUSION

There is no reversible error in the record before us. The judgment of the trial court is affirmed.

February 22, 2019

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Palafox, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by Assignment)

14